## UNITED STATES v. LITTLEJOHN.*
### No. 6236.

Circuit Court of Appeals, Seventh Circuit.
April 8, 1938.

*Writ of certiorari denied 58 S.Ct. 1058, 82 L.Ed. ——.

A. M. Fitzgerald, Geo. B. Gillespie, Edmund Burke, and Louis Gillespie, all of Springfield, Ill., for appellant.

Howard L. Doyle, U. S. Atty., and Marks Alexander, both of Springfield, Ill., and George R. Kennedy, of Alton, Ill., for the United States.

Before SPARKS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

TREANOR, Circuit Judge.

The defendant and three others were indicted under section 338, title 18, United States Code, 11 U.S.C.A. § 338, for using the United States mails to defraud. The defendant and his codefendant Henson C. Robinson were found guilty, and from the court's judgment pronounced upon the verdict of the jury this appeal was prosecuted.

The defendant relies upon the following propositions: (1) The evidence was not sufficient to establish the essential elements of the offense charged, and consequently, the trial court erred in refusing to direct a verdict of not guilty. (2) Highly prejudicial error was committed by the trial court by admitting evidence (a) as to conversations of persons not in the presence of the accused, and (b) as to salaries of employees, income and expenses of the defendant's company. (3) Reversible error was committed by the trial court in its charge to the jury and in refusing to give certain instructions requested by defendant.

The conduct of the defendant, which was the basis of the charge of fraudulent use of the mails, consisted of his activities which were connected with the organization and management of the business of the National Aid Society of Indiana, the National Colored Aid Society of Indiana, and the National Aid Society of Colorado. The Indiana Societies were organized in August, 1930, under a statute of the State of Indiana, which authorized the organization of

corporations not for pecuniary profit. It was recited in the articles of incorporation that the objects for which the National Aid Society was being formed were "to unite reputable men and women of the Caucasian race who are wage earners, not for profit, but for the purpose of giving aid to widows, widowers, creditors and others dependent on its deceased members (nothing in the above shall be construed as to include caring for dependent children) and to'aid its members who become totally disabled, all such aid to be by voluntary contributions and not by fixed dues or assessments." The articles of incorporation for the National Colored Aid Society of Indiana were substantially the same as those of the National Aid Society of Indiana, except that membership in the former was limited to the negro race. The incorporators and first directors of both Societies were A. C. Littlejohn, C. F. Rapp, and H. C. Robinson; and they continued to act as directors for the period during which the alleged fraudulent acts were committed. Littlejohn was made secretary-treasurer and served as such until April 11, 1935. The two Societies began to solicit members and to issue to them certificates ·in the general form of insurance policies. An extensive advertising campaign for agents was carried 'on under the direction of Littlejohn and' the Societies relied upon agents thus obtained to build up the·membership.

Some time after the' formation of the Indiana Societies ouster proceedings were instituted by the Attorney General of Indiana against the Colored Aid Society and a decree of ouster was entered on the ground that the Society, a corporation, was engaged in a profit-making business enterprise which was not authorized by its charter or the 'law under which it was incorporated, and which was unlawful and in violation of the statutes of the State of Indiana. During the ouster litigation the business of the National Colored Aid Society of Indiana was discontinued and its membership transferred to the National Aid Society of Colorado which had been organized by defendant and some of his employees under the nonprofit corporation act of Colorado. The Colorado organization had substantially the same objectives under its charter as the National Colored Aid Society, but the membership of the Colorado Society was not limited to persons of the negro race.

In addition to the foregoing corporations Littlejohn and his associates organized under the general corporation act of the State of Indiana the National Agency Corporation with power to act as proxy, or attorney in fact, for members of the three Aid Societies. After the formation of the latter organization the form of application blank included an authorization to the National Agency Corporation to act as the proxy and agent of the applicant for membership. Defendant was the owner of all the stock in the National Agency Corporation except a few shares issued for organization purposes, and, consequently, exercised the voting power of approximately the entire membership of the various National Aid Societies.

The National Aid Society continued to function under the control of Littlejohn until early in the year 1935. On March 11, 1935, a representative of the Post Office Department interviewed the defendant Robinson with respect to the business of the National Aid Societies, and on the following day he interviewed defendant Littlejohn in connection with the same matter. On April 11, 1935, Littlejohn entered into a contract with one LeBlanc of Lafayette, Louisiana, for the sale of all the stock of National Agency Corporation to Mr. LeBlanc, which carried with it the control of all National Aid Societies through proxies held by the National Agency Corporation. The following 'day, April 12, 1935, the files and records of the National Aid Society, including some of the correspondence, the claim files and applications, the addressograph, application files, account cards, addressograph plates, some typewriter desks and chairs, were removed by truck to Lafayette, Louisiana; and on April 13, 1935, when a subpœna was served on defendant and certain other officials of the National Aid Societies, the only records which were obtained thereby consisted of some of the books of the Societies. Subsequently a portion of the claim files, applications, etc., were obtained from the purchaser, LeBlanc, who had in the meantime moved the business of the Societies to Orange, Texas. The only other assets of the Society transferred to the purchaser, LeBlanc, consisted of several drafts for the total sum of $7,-739.75.

Mr. Littlejohn's testimony respecting the contract for the sale of the stock to LeBlanc was, in part, as follows: "Mr. LeBlanc also offered to give.me an amount equal to two months' contribution collections out of the two societies, which then would have amounted to something like $100,000.00 or

$120,000.00. He gave me a draft for $16,-000.00 which bounced back; would not honor the draft after shipping all the stuff down there; he did not say why. * * * For the stock, filing cabinets, addressograph and all things like that I think I got a total of thirteen thousand dollars; it belonged to me because it came out of the expense account."

The financial result of the operation of the National Aid Society of Indiana during the period that Littlejohn acted as secretary-treasurer is indicated by the following summary:

| | |
|---|---|
| Total contributions received by this Society up to December 31, 1934 | $1,252,363.25 |
| Total death and disability claims paid during same period | 366,323.67 |
| Compensation drawn by appellant during same period | 220,005.05 |
| Benefit fund overdrawn on same date | 2,293.71 |
| Balance in expense fund on same date | 133,751.76 |

A provision in the by-laws gave to the secretary-treasurer, Mr. Littlejohn, as compensation for his services, all contributions collected for the expense fund and certain other fees, the secretary-treasurer being obligated to pay certain expenses connected with the business of the Society. Consequently, the balance in the expense fund as of December 31, 1934, belonged to Mr. Littlejohn, the secretary-treasurer. During the period from January 1, 1935, to April 11, 1935, Littlejohn withdrew $11,975.95, and when the books were closed as of April 12, 1935, there was a net balance in the Expense Fund of $141,000, which was received by Mr. Littlejohn. As shown by the foregoing figures Mr. Littlejohn's total compensation was slightly more than $370,000. In addition to that amount he received substantial compensation from the operations of the Colorado Society.

The allegations respecting the alleged fraudulent conduct are in substance that the defendant by means of false representations, pretenses, and promises, misrepresented the certificate, the benefits to be derived therefrom, the value thereof to the members and their beneficiaries, the methods by which the Society conducted its business, the nature of the protection furnished, the safety of the protection furnished, the cost of the protection, and the soundness and stability of the plans upon which the Society operated, all with the intent and purpose of defrauding applicants for membership in the Societies.

For several years prior to the organization of the National Aid Societies Littlejohn had been active in the insurance field. Six companies which he had organized were liquidated in receivership proceedings. During the operation of all of his insurance organizations Littlejohn had associated with himself as officers and directors his codefendant Robinson, and three others, Greb, Auten, and Rapp. Auten testified that he never attended a meeting of the board of directors of the National Aid Society of Indiana, and that while president of the Society for two and one-half years he delegated his duties and powers to Littlejohn. Greb testified that he attended no meetings of the board of directors of the National Aid Societies of Indiana and Colorado and that "Mr. Littlejohn was in charge and control of those societies." Rapp testified that he was president of the National Aid Society about three years and that he took no part in the business and attended no board of directors' meetings; that he thought he was president of National Colored Aid Society; that he did not attend any board of directors' meetings and had nothing to do directly or indirectly with the officers. Littlejohn testified that he "ran most of the affairs of the National Aid Societies" himself.

Article 2 of the by-laws provides for a board of directors to be elected by the members, one of the duties of the board of directors being to elect the officers of the Society. As already pointed out, each applicant for membership, by signing his application, appointed the National Agency Corporation his proxy; and Littlejohn, through his ownership of the stock in the National Agency Corporation, controlled the proxies.[1] The annual meeting of the

---

[1] Significance of the proxy holding National Agency Corporation in the control of the affairs of the societies is indicated by the following:

(1) "Regular biennial meeting of members February 23, 1935. Robinson, Greb, Knight, Littlejohn, present; balance of members represented by A. C. Littlejohn, controlling stockholder of National Agency Corporation, holder of proxies of membership. The following persons were elected as directors, terms expiring February, 1937: A. C. Littlejohn, H. C. Robinson, F. A. Auten, H. W. Greb, B.

members regularly consisted of Mr. Littlejohn, as a representative of the members, and one or more of the directors. Mr. Littlejohn in fact elected the directors, and as disclosed by the testimony of his associates, administered the business affairs of the Society. There was no independent judgment of the board of directors, and this was inconsistent with representations in the advertising matter, and contrary to the reasonable expectation of the certificate holders.

Section 9 of article 7 of the by-laws provides that the secretary of the Society shall receive as his compensation 100 per cent. of all expense contributions and 100 per cent. of all registration and reinstatement fees. Section 1 of article 5 provides that no member will be called upon to contribute to the expenses of the Society in excess of $4 during the calendar year, and that these contributions shall be made at the discretion of the board of directors. The actual practice was that the secretary, who was Mr. Littlejohn, levied the expense contributions regularly without any semblance of control by the board of directors. It is not without significance that when the National Aid Society of Indiana closed its books and ceased its activities there was available for Mr. Littlejohn out of the expense contribution fund over $141,000 and a deficit in the benefit fund which was for the protection of the certificate holders.[2] And as already pointed out, Mr. Littlejohn received as compensation from the expense contribution fund a total of more than $370,000. No information was ever made available to the certificate holders which could have disclosed to them the distribution of the funds which they contributed to the Societies.

Although each certificate holder was nominally a member of his National Aid Society, his relation to the Society was in fact substantially that of a policy holder in any insurance company, and a member could secure two certificates in each National Aid Society. There was no activity of the Societies as such; and the conduct of their affairs was not influenced in the slightest by the members individually or collectively. The defendant, Littlejohn, completely dominated and controlled the National Aid Societies and it is clear from the evidence that his associates, as members of the board of directors, did not exert any influence over the management policies of the organization. Under the name and the form of a nonprofit organization defendant Littlejohn was conducting an insurance business for profit for himself,[3] and to a lesser degree,

W. Knight." (Minutes of the February 23, 1935, meeting of the membership of the National Aid Society of Indiana.

(2) Dear Member:

"When notice of the February 1, 1935, contribution call was sent to you there was attached notice of a special meeting of the members to be held in March of 1935, with instructions that the proxy be signed by the member and returned to us.

"We regret to say that contrary to our instructions the proxy was not signed, thus creating additional work on the part of this office and necessitating our returning the proxy card to you for the signature of the member.

"It Is Absolutely Important that the inclosed proxy Be Signed by the Member and returned to us in the enclosed envelope. See That This Card Is Signed Now and Returned to Us."

Yours very truly,
National Aid Society,
A. C. Littlejohn,
Secretary.

(Letter from Executive Offices of National Aid Society to members of the Society.)

(3) The contract by which LeBlanc obtained control of the National Aid Societies was between LeBlanc and Littlejohn and recited that Littlejohn was the owner of the entire capital stock of National Agency Corporation; that this corporation held the "proxies of each of said members in evidence of its authority to cast the vote of each of such members"; and Littlejohn estimated the consideration which was agreed upon for the transfer of the stock to be of the value of $100,000 to $120,000.

[2] LeBlanc testified that there were outstanding claims of approximately $100,000.

[3] Mr. Littlejohn testified as follows: "I do not know what the agents told people, but I had this circular printed and approved and sent out; I know the language in it and let it go out because it is a fact that the company was organized not for profit, under the not for profit act, not for profit of the stockholders and other members; I expected to make a profit out of it, that is what I had in mind when I took out the charter; * * * The words 'not for profit' are in capital letters because that was the act we were organized under; it was solely for the protection afforded in the certificate."

"The organizers of the Company surely expect to make a profit out of it, I ex-

by means of generous compensation, for his immediate associates. In short, Littlejohn was selling insurance to all who became members of his Societies and for all practical purposes owned and managed the business as his own personal business.

The evidence was sufficient to compel the jury to draw the inference that the defendant, Littlejohn, devised the setup, and controlled it, for the purpose of conducting a business for pecuniary profit for himself. And it necessarily followed that he falsely represented that the Society's contract holders owned the company and that it was managed strictly for the benefit of the certificate holders, [4] and that the company was not organized for profit.

Also, we are of the opinion that the evidence supports the Government's contention that the advertising methods and the form of the protection certificate with its complicated by-laws, which were set out in fine print on the inside of the certificate, and the methods which agents were encouraged to use, were carefully designed, and utilized, for the purpose of deceiving prospective members as to the scope and safety of the protection to be furnished, the cost of the protection, and the soundness and stability of the plans upon which the Society was being operated.

An extensive advertising campaign was carried on in various newspapers and magazines to obtain agents for the Societies. To each person whose name was obtained a salesman's kit was mailed and the advertisements and the kit contained appeals to the agents to become members of the Societies. All members were urged to become agents of the Society. No discrimination was used in the selection of agents to represent the Societies. In fact special emphasis was placed upon the unimportance of experience or preparation for the work of soliciting members. [5] In a circular letter to prospective agents is found the following: "I ask you to read carefully the enclosed documents—and, in particular, every word of the National Aid Monthly. Especially read Page 4, which tells you all about the Plan of Operation of National Aid. Then, you can quickly explain the benfits of the Society to All those people in your section who are needing and wanting this inexpensive but necessary Protection." A careful reading of the National Aid Monthly referred to in the circular letter discloses no reference to the various conditions and limitations imposed upon the liability of the National Aid Society, and page 4, which is urged upon the attention of prospective agents, contains no suggestion of a duty to explain, or even call attention to, the involved language of the by-laws, which so seriously limited the benefits which a prospective member, or agent, reasonably would expect from the specially emphasized statements in official literature and on the face of the certificate. It emphasizes the plan to furnish "at actual cost as much protection to persons between the ages of 1 and 80, inclusive, as can possibly be provided from contribution calls of approximately $1.00 per month, and allow a maximum death benefit according to age that is

---

pected to make money when I organized it, and to that extent I succeeded."

[4] Literature sent out from the executive offices contained many such statements as the following:

"We do not propose to be in the insurance business in any sense of the word, we are a Society that unite reputable men and women for the purpose of giving aid to our members, and those dependent upon them in case of their death. Not For Profit, but to furnish this assistance at Actual Cost."

"Solicit Memberships for this great benevolent society," "Founded *not for profit* but solely for the mutual protection of its members,"

[5] "Wonderful opportunity. $20.00 daily can be earned. No experience necessary. You can start at once. Showing latest thing out. Self protection and home protection at cost. Ages 1 to 80. Not insurance but provides benefits up to

$1000.00 natural or accidental death. $20.00 per week if sick or injured. Address National Aid Society, Dept. B-316, Springfield, Illinois."

"How The Big Profits Are Made. Applications for memberships are fairly pouring into our office. And they should, because of our sensational offer. We actually send salesmen the names of interested people. We find your prospects for you. And you make $6.00 profit *at once* on each member you enroll. Besides, we pay you a renewal on all your members, which may amount to $2000 extra profit a year. A lot of salesmen secure two and three memberships in a single family. You have no idea how popular our plan is or what money you are missing. So waste no time in mailing the coupon below. Do it today if you want to make this your *big money* year."

fair and equitable to all members." Also on page 4 is found this statement: "The National Aid has never called on its members for more than one dollar per month; it has never rejected a claim; never has had a lawsuit; and its membership is sufficiently large to pay any claim in full."

Those in charge of National Aid Society did not interview prospective agents and did not exercise any personal supervision over their agents. One could become both a member and agent by sending in his signed application for membership, since a prospective agent was authorized to sell himself a membership, and this practice was encouraged in the advertisements and in letters sent out to prospective members and agents. [5a] Furthermore, agents were authorized to make use of sub-agents. [6]

The inevitable result of the foregoing practice, and a result which must be charged to defendant, was that a large number of solicitors were honestly representing to prospective members a degree of safety and scope of protection through membership in a National Aid Society far in excess of the safety and protection which in fact existed. And the jury was justified in drawing the inference that it was the purpose of the defendant to encourage solicitors, who might understand the serious limitations upon the apparent scope of the benefits, to accept applications without disclosing the limitations.

Agents were specially urged to seek prospects among persons who could not obtain "any other form of life protection because of advanced age, physical infirmity or prohibitive cost"; and special emphasis was placed upon the fact that no physical examination was required. [7] For a short period after the formation of the National Aid So-

---

[5a] "I am enclosing your own National Aid Society Life Membership Card—filled out with your name. All you need do to be a participating member and put a certificate in force on your own life is to send us the name of the Beneficiary you select, return an application filled out. Then, you can have your Own Life Membership Certificate to show to every one whom you visit—And You Will Find This Life Membership Certificate Of Your Own (proving that you 'practice what you preach') The Greatest Member-Getting Argument You Can Present to a Prospect!

"I tell you what I would do if I were you—I would take this Life Membership Card and the other literature I am enclosing with this letter and go out To-Day and show it to several of your friends and Sign Up 3 New Members Right Away. There are 3 application blanks enclosed. You have my authority to ask the three new members to pay you $6.00 each, you retain the entire amount. Lots of new representatives do this, and, thus, Make $18.00 Clear The Very First Day they start soliciting memberships." (Excerpts from letter sent by National Aid Society to prospective solicitors.)

[6] "Dear Mr. Howard: The only contract we have for sub-solicitors are the blanks enclosed. You may make your own arrangements with them and report direct to you so a contract is hardly necessary, except the agreement between you two.

"Very truly yours,
"National Aid Society,
"B. W. Knight,
"Ass't Sec."

[7] (1) "Just consider *All* the advantages that will be on your side when you offer anyone our plan to *Protect Themselves And Their Families*.

"*NO Medical Examination Necessary.* There are hundreds of people in your vicinity who will gladly enroll just because of this fact.

"*Protection Up To $3,000.00* (in accordance with provisions of the Membership Certificate) *For Loss of Life Because Of Natural Causes or Accident—$1,000.00 For Accidental Loss of Eyes, Hands Or Feet—or $1,000.00 For Accidental Loss Of One Hand And One Foot!*

"*This Protection For Any Man, Woman or Child Of Any Nationality Or Color From 1 to 80 Years Of Age.*

"—All For Only $1 A Month voluntary contribution!"

(Excerpts from letters to prospective agents)

(2) "Make up to $40 Daily in this Steady Growing Business $6 *cash for you every application you take.* Thousands of persons who cannot obtain any other form of life protection because of advanced age, physical infirmity or prohibitive cost are *eagerly seeking* just the kind of Protection National Aid offers."

(3) "*The Benefits of Life Insurance at a Fraction of Its Cost*
Thousands of people who cannot obtain ordinary life insurance at any price, and thousands of others for whom the sliding scale premiums make their cost prohibitive at their advanced age, will welcome the good news of National Aid."

cieties the application form called for specific statements with respect to the health and medical history of the applicant; but this form was reduced to call for the following information: Name; Town; State; Street; Age; Color; Race; Name of Beneficiary; Relationship; Beneficiary's Address; To whom shall contribution notices be sent; Are you in good and vigorous health? The reason for the elimination of the more specific questions from the application, as indicated by the testimony of defendant Robinson, was that applicants did not answer the specific questions. [8]

The duty of passing upon applications was committed to a clerk and it is a necessary inference from her testimony that applications were approved by her as a matter of form. Many applications were approved in which there was no answer to the question respecting the applicant's health; and others were approved in which the question was answered as follows: "Catarrh"; "Sluggish liver"; "Unusually good for my age"; "To the best of my belief at this time"; "Health fair"; "Reasonably"; "As far as I know"; "Yes for my age"; "Good as usual." The clerk, who was under the supervision and control of defendant Littlejohn, [9] testified that her instructions were that the applicant must answer "yes" or "no" to the question; but her own testimony and the exhibits of copies of applications which were approved reveal that the practice was otherwise, [10] and rendered false the assurance necessarily implied in the defendant's statement "There is safety in numbers if those numbers are as carefully selected as we select them."

The record shows that a large number of claims based upon the certificates of deceased members, who because of advanced age and physical infirmities could not have obtained "ordinary life insurance at any price," were disapproved on the ground that the deceased members were not in good health when they received their membership certificates, In many cases nothing was paid on the claims and in others there was either a compromise payment or a return of all or a part of the membership fees and assessment contributions. This was a fraud upon all who had purchased certificates of membership and paid premiums under the honest and reasonable belief that they were entitled to protection; and in view of the representation that care was used in selecting members it was a fraud upon those who did in fact meet all of the requirements and who had been called upon, and would continue to be called upon, to contribute to the support of the Society. The practice of issuing certificates to ineligible applicants and of giving "refunds" when a claim was made on such certificates placed an especially unfair burden on eligible certificate holders to the advantage of defendant Littlejohn. The "refunds" were charged against the Benefit Fund out of which legitimate claims were paid, whereas all initial payments of $6 and all subsequent expense fund contributions were credited to

---

(4)

"Up to
"$3,000.00
"Maximum Benefit
"Life and Accident Benefit Has Never Exceeded $1.00 per Month After First Year *not insurance but protection at cost* No Medical Examination For men, Women and Children Between the Ages of 1 and 80 Organized Under State Law.
* * * "

(Excerpts from advertisements found in circulars, for agents for National Aid Societies.)

[8] "I don't know the use of having the question on the application, whether they had cancer, if they didn't answer it, that is why it was discontinued." (Testimony of Mr. Robinson)

[9] "They (applications) were passed on and Miss Moughan was in charge of that department. The only control I had over her was she received all her orders from Mr. Littlejohn and I had to see that they were kept busy. I had no overseeing of her work at all. It was not really left to me to see that her duties were carried out properly; they always worked under instructions of Mr. Littlejohn; I could not say whether any one ever investigated to see whether they were doing their work properly, I never did." (Testimony of Mr. Greb)

[10] Defendant Robinson testified that "we accepted the statement of the member as to his good health for the purposes of issuing the certificate, but always investigated when the claim arose"; and he also stated that "there was no membership committee to pass upon members" although in an affidavit for use in a suit filed against the National Aid Society in the State of New York defendant Robinson swore that all applications for membership in the society were referred to the membership committee of said society for examination for the purpose of determining whether such applications should be approved or rejected.

the expense fund which was the personal fund of defendant Littlejohn.

The foregoing forces the conclusion that it was a part of the scheme of the defendant Littlejohn to encourage solicitors to obtain applications from persons whose health and physical condition made them ineligible for membership in the Society under the strict provisions of the by-laws; to make its scheme effective by the practice of approving applications without any serious consideration of the same. Such a conclusion is inevitable when those in control of the business of the Society utilized the services of solicitors who were without experience and urged them to sell certificates of membership to "persons who can not obtain any other form of life protection because of advanced age, physical infirmity, or prohibitive cost," "people who can not obtain ordinary life insurance at any price"; and when applications were accepted as a matter of course and the physical condition of the applicant not investigated until after his death.

We are of the opinion that the facts support the government's contention that the defendant actively concealed from prospective members the effect of the provisions in the by-laws. In considering the foregoing charge the jury had to consider the provisions of the certificate, including the terms of the by-laws, in the light of the type of agents used, and the classes of people who were singled out as the source of membership; and to evaluate the effect upon agents and prospective members of the representations in the letters, circulars, and official printed matter sent out from the office of the Society.[10a] Also it was a material fact that a prospective member paid his membership and registration fee when he signed his application blank which was mailed to the office of National Aid, and did not receive his certificate from the solicitor, but by mail from the office at Springfield, Illinois. Many prospective members sent in their applications direct and upon the basis of representations made in advertisements.

On the face of the certificate is found a schedule of maximum benefits "according to attained age"; also a table of maximum benefits to be paid for certain specific disabilities. Throughout advertisements and literature, which was circulated among agents and members of the society, are found tables which set forth the maximum benefits in substantially the same form as they appear on the face of the certificate. An examination of these tables, or schedules, would indicate that the amount of benefit is fixed by the age brackets and nowhere does there appear any statement of the limitations upon these maximum benefits, except in the by-laws which are printed in small type on the inside of the certificate.

Defendant contends that the by-laws are easily understood and that certificate holders could not have been deceived by them. Yet the minutes of the meeting of directors on June 26, 1934, recite that Mr. Robinson was of the opinion that the by-laws of the Society should be clarified and amended, and that there was considerable ambiguity in the language of the by-laws and considerable differences of opinion in construing the intent, "particularly in reference to claims accruing under the certificates." At this meeting, which was held approximately four years after the organization of the Society, a committee was appointed to make changes in the by-laws and some changes were made. But the careful analysis and explanation by Mr. Fackler, expert witness for the government, of various provisions of the by-laws defining the nature and scope of the protection afforded, leaves no doubt that a certificate holder of average intelligence could not have understood, by his unaided study, the substantial limitations upon the apparent scope of his protection. For example, a prospective member would believe from reading the literature and from statements which the solicitors were authorized to make that substantial protection would be afforded by reason of the provisions covering auto death, travel death, or specific disabilities. But Fackler concluded that the benefits would be negligible

---

10a "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious.

The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of caveat emptor should not be relied upon to reward fraud and deception." Federal Trade Commission v. Standard Education Society et al., 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. ——.

in view of the conditions imposed by the terms of the by-laws, and in his opinion the benefits were so negligible that he did not consider them in estimating the dues which it would be necessary for the National Aid Societies to collect in order to insure their continued operation. And the defendant Robinson who had charge of the settlement of claims for the Societies agreed with Mr. Fackler's conclusion in so far as the disability claims were concerned.

The literature distributed from the headquarters of the Societies emphasized that the National Aid Society paid its members up to $3000 in case of accidental death, loss of limbs or other disabilities while traveling—up to $2000 in case of automobile death, and up to $1000 in case of natural or accidental death; yet during the 4½ years of the life of the National Aid Societies there is no record of the payment of a single claim arising out of "a travel or automobile death" although over 135,000 certificates were issued; and the total disability claims paid amounted only to the sum of $2,595. Over one third of all the claims were settled by payments of sums less than $20 each. The actual experience of the Societies strengthens the government's contention that the certificates did not furnish the liberal benefits which defendant and his associates continuously and forcibly urged in communications to solicitors and members of the Societies.

The subject matter of article 4 of the by-laws, as stated in the title, is "Natural or Accidental Death Benefits"; and section 1 deals with the subject matter indicated by the title. Section 2, however, is devoted to involved statements of limitations on the maximum benefits which are set out on the face of the certificate. The effect of the language in section 2 is to limit the maximum benefits to one fourth of the sum stated on the face of the policy for the first nine months of the life of the policy; and the maximum amounts are reached by periodic increases.

Section 3 of article 7 contains a list of "diseases or causes" and provides that if any member should die or his death be caused directly or indirectly from any of the diseases or causes, "suffered by the member within two years from date of this certificate, or within two years after reinstatement of this certificate," the Society's lia-

bility would be limited to one fifth of the amount "otherwise payable under the terms of this certificate." It was also provided in the same section that the liability should be one half "of the amount otherwise payable" if death should be caused from surgical operation, lung trouble (other than tuberculosis) "or unknown cause" within the two-year period.

The language "suffered by the member within two years" was construed to refer to the inception of the disease or cause and not to the death. Consequently, if the member suffered or contracted a disease within two years from the date of the certificate or within two years from the date of his reinstatement, and died either during or subsequently to the expiration of the two years period, as a result of the disease, or cause, the Society recognized liability for only one fifth of the maximum benefit stated on the face of the certificate. Expert testimony was introduced to show that 97 per cent. of the people between the ages of 40 and 80 years, who die from any disease, will die from one of the diseases listed in section 3 of article 7. And the average age of members in National Aid was not less than 62 years. [11]

The intense publicity directed to the table of maximum benefits, which is found on the face of the certificate, and the absence of any suggestion of the serious limitations upon the maximum benefits as provided for in articles 4 and 7, and the obvious obscuring of the limiting provisions of those articles, justify an inference that the defendant and his associates intended to deceive prospective members as to the scope of the protection which they would have under their membership certificates.

In connection with the foregoing the reinstatement practice is significant. Nowhere in the by-laws is there any direct and clear statement of the effect of a lapse of membership and a reinstatement. Section 6 of article 7 is headed "Reinstatement of Lapsed Members" and states the reinstatement procedure, but there is nothing stated therein which would indicate that a reinstated member's protection is not also reinstated in full. In the absence of some definite statement to the contrary in the reinstatement section, a member reasonably would suppose that reinstatement carried with it a restoration of his rights as

---

[11] One solicitor testified: "I wrote between four and five thousand members in my office at Newark. At least 75% were over the age of 60."

they existed when the certificate lapsed. And only by a close reading of the sections of the by-laws which cover the limitations on maximum benefits could a prospective member, or one desiring reinstatement, discover that a reinstated member's protection was subjected to all the limitations contained in articles 4 and 7.

The record shows that for the year 1933 there were 14,900 reinstatements at $1 per reinstatement; and for the year 1934 there were 12,756 reinstatements. Assuming that many of these reinstatements were reinstatements for the same certificate holder, these figures would indicate that several thousand people were being reinstated each year with the result that these thousands of reinstated members were all subject to the serious limitations imposed by articles 4 and 7, regardless of the period of time that had lapsed since they had obtained a "life membership."

In the advertisements and in the printed material which was circulated among the solicitors and members of the Societies the protection was described as "safe," "dependable," of "sound financial stability and integrity," etc. The circular letters and special literature, as well as numerous advertisements sent out from National Aid Society, contained statements which were designed to convince the reader that the Societies could operate indefinitely on assessments of one dollar a month, although under the by-laws a total of sixteen dollars a year could be collected, consisting of twelve one dollar assessments for the benefit fund and four assessments of one dollar each for the expense fund. Yet Mr. Fackler, the government's expert, was of the opinion that a Society operating in accordance with provisions of the certificate furnished by National Aid could not operate successfully for a continuous period and fulfill the obligation of its certificates upon the basis of the assessment contributions provided for by the terms of the certificates. After an exhaustive study of the certificate issued by the National Aid Societies Mr. Fackler computed tables of rates which, in his opinion, would enable the Societies to operate. These rates were considerably higher than the rates under which were collected assessment contributions authorized by the by-laws of the National Aid Societies, and in making his computations Mr. Fackler considered the actual experience of the Indiana Society for the period of its organization to and including December 31, 1934. He explained that even his rates were not such that he could recommend them for the use of the Society but stated that he was trying to arrive at a rate which he believed "they might possibly get by on." In arriving at his conclusion he took into consideration the pro rata clause of the by-laws. He stated that in his opinion, based upon the observed experience of assessment societies, recourse to the pro rata clause destroyed confidence and caused members "to drop their insurance unless they hoped to get some insurance in the near future from such clause by reason of being in poor health"; and he stated definitely that the "effect of the operation of such clause, as a matter of actuarial experience, is to break up the operations of the society"; and that "the minute there is a lack of confidence, the good lives drop out and the poor lives stay in, causing a heavier load than otherwise."

From his computation based upon eight assessments a year for the benefit fund Mr. Fackler testified that the amount available for payment of claims would be inadequate for all age groups above the age of 9 years. And assuming that 12 assessments should be collected the deficiency would start at age 33. At age forty the deficiency would be about 19 per cent.; at age fifty, 35 per cent.; at age seventy, 15 per cent.; at age sixty-five, 27 per cent.; and at age seventy-five, 28 per cent.

Mr. Littlejohn had had a long experience in the management of several mutual benefit assurance societies which operated on much the same plan as the National Aid Societies, and issued policies on the basis of $1 per month premiums; and these companies eventually passed into receivership after varying periods of operation of less than ten years. Despite this experience and Mr. Littlejohn's obvious knowledge of the necessity of an adequate premium schedule, no attempt was made to compute and set up a schedule of rates to supply the protection which the defendant and his associates represented was being furnished. About four years after the Society had been organized Mr. Skinner, an insurance actuary, made a study of the certificates of a group of persons with an average age of seventy years. He recommended that the benefits for the age groups "above 71 years of age be cut in two." He further testified that he thought the recommendation "would assist materially in a lengthy continuation of the or-

ganization of the National Aid." Mr. Fackler testified that the premiums were too low to pay the graded benefits even after making the reduction recommended by Mr. Skinner.

There is considerable evidence in the record which indicates that Mr. Littlejohn was anticipating an early demise of the National Aid Societies for reasons other than his knowledge of their inherent financial weakness. There are many references in letters to and from Mr. Littlejohn which show a knowledge of a legislative and administrative policy in different states adverse to the activities of the National Aid Societies.

The activities of the National Aid solicitors were being opposed by the state insurance departments of various states; and there are specific references in the record to opposition in Kentucky, New Jersey, Minnesota, Indiana, Illinois, and Michigan. Ouster proceedings had been brought in Indiana and after an adverse decision in the trial court a charter for National Colored Aid Society business was obtained in Colorado and its business was transferred to the Colorado corporation.[12] Although the executive offices of the National Aid Societies were in Springfield, Illinois, the Societies could not issue certificates in that state, the position of the insurance department being that the Societies were in fact engaged in the insurance business and could not operate in Illinois without complying with the laws regulating insurance companies.

A letter from Mr. Littlejohn to Mr. LeBlanc, of the date of February 20, 1935, contains the following: "To tell you the truth the only reason I am not interested in the oil proposition is because I am liable to have to raise a hundred thousand dollars for increased capital in my life company so that I can be licensed in every state in the Union should the proposed legislation in the various states go through. But believe me, I don't want any laws of that nature to be enacted because we can do a lot of things in the society that would not be possible in the life company." And Mr. LeBlanc writes to Mr. Littlejohn under date of March 22, 1935: "I am very much interested in taking over the National Aid. Of course, there is so much unfavorable legislation being proposed that it is doubtful whether we will ever be able to continue operation. However, you and I should not have any trouble in getting together. You could retain all of your furniture and fixtures; all we would want would be the applications of the members and your records of payment by the members for the past three or four years." And the contract of sale of the National Aid Societies to Mr. LeBlanc provides for protection to Le-Blanc in case it should become impossible "to collect or in any manner whatsoever control the contribution calls" because of "the decree of judicial, legislative, or departmental authorities."

Mr. Stahl, post office inspector, testified to the following conversation with Mr. Littlejohn: "He said, 'I am the Society'; that nobody else knows how much I get except the auditors and income tax people; that eventually the Society would be all old line life insurance because in a few years it would be necessary to pro rate benefits to members and that would be no good. I said it looks like you took $100,000 out of National Aid Society and put it in National Aid Life. He said, 'That is obvious. I made money in one to start the other.' * * * I asked him if all members would be benefited. He said all members could not get something out of their memberships but some could. I asked him how long National Aid Society could operate before it would be necessary to prorate and he said he intended to organize National Aid Life to take over its members but found it was impossible because members could not pay premiums in National Aid Life." Mr. Stahl also testified to the following conver-

---

[12] "Mr. Littlejohn stated the Society was being constantly harassed and reviled by the Insurance Department of the State of Indiana and the Attorney General of the State of Indiana because they are contending that National Aid Society is doing the business of insurance while the charter under which the Society operates is not a charter for the purpose of transacting the business of life insurance. He stated that although it is a matter of common knowledge among the Directors of the Society that National Aid Society is not transacting the business of insurance in violation of its charter rights, and although he was confident that a test case upon that issue would bear out the opinion of the Board, that in view of the constant pressure and unfavorable publicity that the Society was receiving in Indiana that it would, perhaps, be advisable to seek a charter in some other state." (Excerpt from minutes of meeting of directors August 25, 1933.)

sation with Mr. Robinson: "A few days after April 3 I met Robinson in the Leland Hotel; just returned from a trip to Indianapolis for the purpose of acquiring an existing charter so that members of National Aid Society could be placed in a concern under supervision of an insurance department. He said he had been unsuccessful. I again stated that I did not believe National Aid Society would work; that is continue for a very long period. He said any school child could sit down with a pencil and figure that out."

We think there was sufficient evidence to compel the conclusion that defendant Littlejohn knew that the National Aid Societies could not continue to function for a considerable period of time and that he knew that the representations which were made by his authority as to the financial stability and integrity of these Societies were false.

In addition to the more general representations as to the stability of the Societies there were specific representations which were made for the purpose of indicating. financial responsibility and dependability and which were without foundation in fact. As late as March 13, 1935, literature was being distributed to agents of the Society which contained the bald statement that "the National Aid Society has never rejected a claim." Yet the evidence is that claims were being regularly rejected on the ground that the deceased certificate holders had not been in good health at the time of the delivery of the certificate. Many of such claims were disposed of by a "refund" of part, or all, of the payments which had been made by the deceased. It is true that Mr. Robinson, who was in charge of the claim department, testified that he considered benefits "as anything they received under the contract"; and that he felt that "a refund was a benefit where the company was not liable to return the money." But it is hardly necessary to suggest that any such explanation does not eliminate the false implication in the statement that the Society's "strength and dependability are evidenced by the fact that the National Aid Society has never rejected a claim." Also with respect to the financial stability of the Society the representation was made that the Societies had accumulated assets of more than $100,000. There was an accumulation of approximately $100,000 in the expense fund of the National Aid Society of Indiana on January 31, 1934. And this fund increased to approximately $140,000 at the time that Mr. Littlejohn transferred the business of the Societies to Mr. LeBlanc. But this fund was the personal property of Mr. Littlejohn and he treated it as his own property by taking all of it when the books of the National Aid Society were closed in April, 1935. It was from this fund that Mr. Littlejohn received approximately $370,000 as his compensation. It is true, as stated by defendant Littlejohn, that this fund, since it belonged to him, could have been used as a buffer for the Societies. But it is perfectly evident that it was not understood to be for that purpose. By the terms of the by-laws it belonged to Littlejohn and he treated it as his own personal asset.

There were specific representations as to the management, such as "the same officers that manage National Aid Society control and manage several other Societies of a similar nature; also several insurance companies, and all being under one management a large overhead is saved which reflects in the low cost of the protection," when, in fact, the evidence shows that Littlejohn alone controlled the affairs of National Aid Societies. Also the National Aid News, a publication circulated among the members of the National Aid Societies, carried the picture of Mr. Greb and represented him as treasurer of National Aid Society and referred to his banking experience as giving him special qualifications. Mr. Greb testified that he did not take care of the funds of the Society; that he did not examine the disbursements of funds to determine whether they were proper; that he was not treasurer and did not discharge any of the duties of treasurer of the Societies.

The defendant concedes that the United States mails were used to carry on the activities of the National Aid Societies. We conclude that the evidence was sufficient to sustain the government's charge of using the mails to defraud and that the trial court did not err in overruling the defendant's motions for a directed verdict.

The defendant contends that the trial court erred in admitting in evidence certain conversations of agents, solicitors, and prospective purchasers; the conversations not being in the presence of the accused. The purpose of the testimony of these witnesses was twofold: (1) To prove the receipt through the United States mails of specific letters and other mail matter which is set out in the indictment and alleged to have been sent through the United States

mails in violation of the law; and (2) to sustain the allegation of the indictment which charged that it was a part of the scheme of the defendant "to induce their agents to transmit the false representations, pretenses, and promises contained in the literature to the prospective members."

Defendant relies strongly upon the case of Beck v. United States. [13] It is stated in the opinion of that case that the "trial proceeded on the theory stated by the court that any representation made by those employed by the company was competent, irrespective of Beck's knowledge, authority, or ratification; and this was error." But in the instant case the trial court admitted the questioned testimony on the theory that the statements made by agents or solicitors to prospective purchasers were authorized by the defendant. This authority was established by the introduction of evidence which clearly disclosed that the persons who purported to represent the Society had authority to solicit members; and by the introduction of letters and other printed matter which sufficiently established the authority of the solicitors to make the representations which they and the members testified were made. Assuming the solicitors had authority to make the representations it was a legitimate part of the government's case to prove that the representations were actually made and acted upon by persons who were solicited to become members.

■■ The defendant also contends that it was error to permit the introduction of evidence respecting the salaries of employees and the income and expenses of the company. Inasmuch as a part of the government's case consisted of proving that there were misrepresentations made as to the prudent and economical management of the company it was proper to introduce evidence tending to show that there was not prudent and economical management in the matter of salaries of officers and employees and income and expenses generally. The trial court should not have permitted the introduction of evidence of conduct which had no appreciable relation to the question of prudent and economical management, and especially if any particular item of such evidence had a tendency to prejudice the cause of defendant. Defendant calls special attention to the admission of testimony with respect to the payment of $150 per week for a period of a year to the defendant's daughter who, according to the testimony, performed her duties at home and had her checks mailed to her home. We see no reason why evidence of salary paid to defendant's daughter should not have been introduced along with evidence of salaries paid to other employees and of expenditures for services generally. The defendant's right to show that all expenditures were prudently made was not questioned.

We do not think the trial court erred in the admission of the foregoing evidence.

■ Defendant contends that the following statement made in the course of the court's charge to the jury contains prejudicial error: "And it is the law that a person intends the usual and probable consequences of his acts." The gist of defendant's objection to the statement is that it told the jury there was a legal presumption of fraudulent intent if the jury should find that false representations had been made by the defendant. And defendant urges that the result of the foregoing was to cast upon the defendant the burden of disproving such intent "when the government at all times had the burden of proof on this question." The statement in question is contained in the following paragraph: "Intent, gentlemen of the jury, is something that exists in a man's mind. It is impossible for you to enter into the minds of the Defendants to determine the intent with which they operated. Therefore one's intent has to be judged, to a certain extent at least, by his intelligence as shown by the evidence; by his experience in life as shown by the evidence; and generally by judging him as reasonable, prudent men, experienced in the every-day affairs of life, judge each other, and it is the law that a person intends the usual and probable consequences of his acts." It will be noted that the statement is a part of the sentence which furnishes the jury with practical suggestions to aid them in determining the intent of the defendant. The effect of the application of the legal presumption that one intends the natural and probable consequences of his act is merely to attach personal responsibility to the doer of the act for its factual consequences, which are natural and probable. The quality, good or bad, of the mental state of the actor is not involved in the application of the presumption, and if in the instant case the jury found that the natural and probable consequence of the acts of the defendant was that solicitors would make certain representations to pro-

---

spective members, the making of such representations was attributable to the defendant, apart from any question of agency. But even if the jury should have found as a fact that such representations were false and were such that prospective members would reasonably rely upon them to their injury, that fact could not be made the basis of a legal presumption of an intent on the part of defendant to fraudulently deceive the prospective members. It would be a fact for the jury to consider, along with all other facts and circumstances, for the purpose of determining as a fact whether the defendant entertained a fraudulent intent. But the conclusion that such fraudulent intent existed would be an inference of fact and not a presumption of law.

In the cases relied upon by defendant the prejudicial statements of the trial courts treated the rule that one is presumed to intend, or contemplate, the natural and probable consequences of his acts as being equivalent to "the intent to injure or defraud may be presumed from an unlawful act which results in loss or injury, if proved to have been knowingly committed." [14] And since a presumption must stand until overcome by sufficient evidence the result was, at least partially, to nullify the presumption of innocence and to permit the fact of "fraudulent intent," an essential element of the crime charged, to be established by the application of a rule of law.

In Agnew v. United States [15] the trial court had instructed the jury that "an intent may be presumed from the doing of the unlawful, fraudulent or illegal act," and that "such an inference or presumption throws the burden of proof upon the defendant, and the evidence upon him in rebuttal to do away with that presumption of guilty intent must be sufficiently strong to satisfy you beyond a reasonable doubt that there was no such guilty intent in such transaction." And despite the foregoing questionable statements the Supreme Court concluded that considering the charge as a whole the question of particular intent was not treated as a question of law but as a question of fact to be submitted to the jury, and that the defendant was not prejudiced. We are of the opinion that the charge as a whole in the instant case was so clear on the point of the government's duty to establish the element of intent as a fact that the jury could not have misapplied the statement in question and concluded that proof of the making of false representations created a legal presumption of the existence of a fraudulent intent. They must have understood from the charge that the fact that false representations had been made, if they found such to be a fact, was to be considered along with all the other facts in determining the ultimate fact of the existence of fraudulent intent. [16]

The defendant urges that the trial court erred in refusing to give a requested instruction stating the duty of the Postmaster General to instruct postmasters to exclude fraudulent matter from the mails, and which charged the jury that if they believed that an inspection of the business of the National Aid Societies had been made by authorized representatives of the Post Office Department, and that no action was taken by the Postmaster to deny the defendants the use of the mails, that the jury should take that fact into consideration, to-

[14] Hibbard v. United States, 7 Cir., 172 F. 66, 18 Ann.Cas. 1040.

[15] 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624.

[16] The following excerpts are from the paragraph preceding the one in which the statement in question is found:

"It is not sufficient for the government to prove that the statements or representations made by the defendants' were false. The government must go further and prove beyond a reasonable doubt not only that the statements or representations made by the defendants were false, but the government must also prove by the evidence beyond a reasonable doubt that such statements were known to the defendants to be false, or that the defendants had reasonable grounds for believing that they were false and that they were made with the intent to injure other persons, or to deceive them, or to deprive them of their money wrongfully. * * * So on this question of intent, you are to take all of the evidence and consider it fairly, and decide whether the defendant or defendants, in his or their minds, intended in good faith to establish and conduct benefit societies or not. If he did, then he is not guilty, irrespective of what happened to these societies or to claims made against them. On the other hand, if he or they had no intention of establishing and conducting benefit societies in good faith but was simply trying to get people to give up their money as a result of a fraudulent scheme, and used the post office establishment in the execution of such scheme, then it is your duty to find him guilty."

gether with all other evidence in the case, in determining the intent and good faith of the defendant. We think the instruction was properly refused. The court told the jury that they could consider the fact that the defendants made a full and complete disclosure to the Post Office Department long prior to the date of the return of the indictment which showed substantially the same methods of operation by the defendants as those of which the government complains in the indictment, and the fact that no -action was later taken by the post office authorities in connection therewith, during the intervening period in determining the question of the intent or good faith of the defendants in the organization and conduct of the business of the National Aid Societies. We fail to see how the fact of delay on the part of an administrative officer in stopping the use of the mails by the defendants could have any probative value in establishing the good or bad faith of the defendants in using the mails. The defendants were entitled to have the jury consider the conduct of the defendants in turning over to the government information requested by the government at the time of the prior investigation in 1932. And this benefit was afforded them by the instruction which the court gave.

We find no reversible error.

The judgment is affirmed.