### UNITED STATES v. LANZA.*
### No. 382.

Circuit Court of Appeals, Second Circuit.
Aug. 13, 1936.

Caesar B. F. Barra, of New York City (Ralph J. Barra, Nicholas P. Iannuzzi, and Julius I. Puente, all of New York City, of counsel), for appellant.

John Dickinson, Asst. Atty. Gen., John Harlan Amen and Albert J. Law, Sp. Assts. to the Atty. Gen., Joseph A. Barrett and Andrew Bennett, Sp. Assts., and John C. Herberg, Sp. Atty., of Washington, D. C.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appellant was convicted and sentenced, together with other defendants tried at the same time, and alone has appealed. The indictment, which superseded the original one, charged in the first count a conspiracy to restrain trade and commerce in fresh water fish among the several states; in the second count, a conspiracy to monopolize such trade and commerce in such fish; in the third, an attempt to monopolize such trade and commerce in such fish; and, in the fourth, that they did monopolize such trade and commerce in such fish. The appellant was convicted on all the counts, and was sentenced upon all.

He has not attempted to question the sufficiency of the evidence to prove, as the jury found, that the unlawful conspiracy and monopoly existed. The evidence as to that is, indeed, so strong that to question it would have been futile. But the appellant does argue that there was no evidence connecting him with the unlawful acts shown on the part of others and that there was reversible error in the admission of evidence and in the opening statement of the prosecutor to the jury. So it will be necessary to outline the nature of the evidence upon which reliance is placed to sustain the verdict and judgment against the appellant.

From it the jury was justified in believing that by far the greater part of the fresh water fish handled in the New York market is shipped there from states other than New York; that by 1932 the retail dealers had combined, after some trouble, what may be called their Brooklyn association with their Bronx and Upper Manhattan association into what became known as the Bronx, Upper Manhattan, and Brooklyn Fish Dealers Association, with one of the defendants, Kiselik, acting as the so-called impartial chairman of the combined associations; that Kiselik was endeavoring to have the wholesale fresh fish dealers organize and co-operate with the retail dealers to extend the control of the business; and that to bring this about he arranged a meeting of the wholesalers at the Half Moon Hotel in Coney Island; that at this meeting the appellant, who was a delegate of the United Sea Food Workers Union, was present and sat with Kise-

lik at a table on the dais but did not address the meeting; that most of the wholesalers attended and were told of the organization of the retailers and urged by Kiselik and one O'Keefe to organize to remedy the market conditions in concert with the retailers; that a committee was appointed to try to work out a satisfactory plan for the division of profits on a percentage basis; that the report of this committee was received and discussed but not then adopted, and that the meeting broke up without taking any definite action; that O'Keefe continued his efforts with individual wholesalers, and in about two weeks had worked out a scheme for co-operation on a changed basis which seemed likely to be generally approved; that within four or five weeks he had formed another committee consisting of five wholesalers who agreed, and that he then submitted his plan to the committee formed at the Half Moon Hotel; that the result was the formation of a profit-pooling association; the assignment of percentages to wholesalers; the formation of a representative committee to collect information as to supply, prices, bad debts, credits, and the elimination of duplication; that in carrying out the scheme, which was really one to monopolize the business, they used threats and violence, extortion, boycotts, levies upon dealers who were coerced into paying; picketing; made charges for opening new stores; created labor disturbances; and that they fixed prices and attempted to maintain them by threats and violence.

Aside from the presence of the defendant at the meeting at the Half Moon Hotel, his connection with the scheme was shown only by evidence in substance as follows: One of the large dealers, Booth Fisheries, had trouble with the organization. It was indebted to the Guaranty Trust Company, and O'Neill of that bank undertook to look into the matter. He talked with a friend, Reardon, who knew the appellant and who told him that O'Neill had inquired about the Booth situation. Lanza said that he had nothing to do with it, but that he would take him to the man who handled the fish end of the business and took him to Kiselik. Reardon asked Lanza and Kiselik if they would go to the Guaranty Trust Company with him to meet O'Neill and they assented and went. O'Neill and Kiselik talked over the difficulties which had beset the Booth Fisheries, while Lanza either

talked with Reardon a few feet away or listened to what was said. O'Neill explained that the Booth Fisheries Company was having trouble in New York, and was informed that Booth had not co-operated. During the conversation, Heinrichs, who had charge of the principal office of the Booth Fisheries Company in Chicago, and who was trying to adjust the trouble that had arisen in New York, came in. O'Neill testified in part that, after Heinrichs came into the room, "I explained that these men had represented that Booth was not behaving in a cooperative fashion and that I wanted him to sit down and find out if to any extent or in any way Booth was to blame and that the matter might be straightened out. He made some comment about it being too expensive to cooperate, and I commented that a credit and collection service should not be unduly expensive, even on the basis explained to me." This conversation led up to an arrangement later made whereby Booth paid the agreed fee and was allotted 12½ per cent. of the fresh water fish business in New York.

All of the hand truckmen in the fresh water fish markets in New York belonged to the United Sea Food Workers Union, of which the appellant was the delegate. There was evidence that these hand truckmen refused to load fish for a retailer named Rosenwasser until he had seen Kiselik and promised to join the association. A retailer named Seif testified that he bought some fresh water fish in Philadelphia and then bought some salt water fish in New York. The salt water fish was loaded on his truck by the hand truckmen, but an hour or so later, while his truck was still at the market where he bought the fish, Kiselik came and asked him how he dared buy sweet water fish in Philadelphia. He replied that it was cheaper there, and Kiselik then told him he could not buy salt water fish in New York. A few minutes later the hand truckmen who had loaded his fish took it off his truck. There was other evidence of similar conduct by the hand truckmen belonging to the appellant's union.

One Waldman, a retailer and speculator in the fresh water fish business, testified that he opened a new place of business and that Kiselik asked him "if I see his friend Joe Socks" (a name shown to be one by which appellant was known), and when asked about that Kiselik told him he must

pay $1,000 for his friend Joe Socks, "for the reason that Joe Socks needs the money." After consulting one Aaronson, Waldman satisfied this demand by paying Kiselik $500. At one time while Kiselik was talking with Waldman about the money the appellant stood "a couple of steps away," but said nothing. Later Waldman asked the appellant if he could get the $500 back, but the witness could not remember the appellant's reply, and the money was never returned to him. The witness also testified that he bought fish outside of New York several times and brought it to New York to sell. That Kiselik, the appellant, and three others were present when a conversation was had with him about purchases outside New York, and Kiselik "helped me straighten this thing out, and that I should buy fish in New York." The appellant was not present when the talk began, and the witness could not remember whether he remained to the end or that he said anything.

After the original indictment in this cause, some of those who were acting in concert under the arrangements they had made in regard to the fish business apparently became apprehensive, and a meeting was called which was attended by 175 or 200 retail dealers. At this meeting the appellant was one of those who made speeches. The testimony of Sam Moskowitz appears in the record in part as follows:

"I recall the time the association started to break up and the members stopping their dues. That was after the original indictment was returned in this case. I attended a meeting at which Joe Lanza made a speech at that time. I was outside and the people told me there would be a meeting. Joe Lanza passed by and said, 'Moskowitz, come on, we are going up to a meeting.' I said, 'I will get rid of my fish buying, I will go up.' When I got there Lanza was there. The room was packed and a couple of hundred of people were there. Lanza was in front. I do not know who was with him. Manny Lippman, Jerome Kiselik and many people were there. Lanza said, 'We should keep on with this organization, and with the same officers, and with the same charge,' and that it would be better for the retailers, and that if we keep this organization the union would be on top of us, because the retailers are very poor, and they could not afford to pay union wages. I said at the meeting that it would be better to have our organization of retailers."

On cross-examination the witness testified: "Jerome Kiselik was there. I spoke to him at that time upstairs in the room. He did not make a speech. I heard Joe Lanza say something. He spoke about Communists and about a different union, and if we did not have this organization, we would have a union, and that it was better to have the organization than to have a union. I could not remind myself what he said—a Communist union or a plain workers' union. He spoke about a union and we would not be bothered by the wholesalers any more. I heard him speak for the retail fish dealers, a code of the N.R.A. in Washington. He said, 'If you break up this organization, if you have not this association, you will have a union on top of the retailers.'"

From the foregoing partial summary of the evidence, it will be seen that the jury was justified in finding that the appellant knew of the unlawful combination in violation of the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1–7, 15 note) as charged in the superseding indictment and was familiar with much that was done in furtherance of it. And that with such knowledge he advocated the continuance of the organization by means of which the unlawful acts were done to carry out the plan. Though there was some evidence that he was only working toward the setting up of a code under the National Recovery Act, 48 Stat. 195, that was an explanation of his conduct which might or might not be accepted by the jury, and it was not. We think the evidence in the record is ample to support the verdict and judgment.

On cross-examination, Waldman was asked whether he testified at the former trial that the money he paid was going to the association. He replied, "Yes, I did, I was afraid to talk any further." Upon redirect examination an attempt was made to learn from him why he had been afraid, but he was evasive. In response to questions by the court, he said that something was said to him; he did not know who said it; they came into his store and told him not to talk. The court ordered the statement that they told him not to talk stricken out. He was asked if he saw any one in the courtroom who talked to him, and he testified that he did not. The appellant duly excepted, moved for a mistrial, and now urges that the denial of the motion was reversible error. All that need be said, however, is that the questions were asked in an attempt to explain what was

brought out in cross-examination, and even that failed in so far as anything definite became a part of the record. The appellant was not prejudiced. See Sullivan v. United States (C.C.A.) 75 F.(2d) 622; Shipley et al. v. United States (C.C.A.) 281 F. 134; Vandell v. United States (C. C.A.) 6 F.(2d) 188.

■ Exception was taken to permitting O'Neill to testify that when he talked with Kiselik the appellant was apparently an interested listener and "took no exceptions to representations made by Kiselik." This was clearly admissible. It related to the conduct of the appellant at a conversation when he was present while the business of the conspiracy was being discussed. That he remained silent was a part of what transpired. He had been approached about the matter in hand and had volunteered to get the man who was in charge. Having done that, he remained to hear what that man said. Plainly Kiselik was speaking as the man the appellant himself had produced to discuss the matter with Reardon and, at Reardon's request, with O'Neill. Under those circumstances it was proper to treat his silence as indicative of his assurance that what Kiselik said was correct. At least, that was a fair inference to draw, and that made it a proper subject for the consideration of the jury. See Morris v. Norton (C.C.A.) 75 F. 912; Graham v. United States (C.C.A.) 15 F.(2d) 740; Bilokumsky v. Tod, 253 U.S. 149, 44 S. Ct. 54, 68 L.Ed. 221.

■ One Lillie Eber was allowed to testify under exception that, after she had opened a new retail store after the association had told her not to, an unidentified truckman at the market unloaded her fish and took it away, and she later went to the rooms of the association, where she became a member and settled for $25, after $100 had been demanded. We can perceive no error in that. The cases relied upon by the appellant deal with hearsay statements, but in this instance the truckman who removed the fish said nothing except to state the self-evident fact that the fish was gone. Likewise it was not error to permit the witness Kremen to testify that, when the appellant made the speech already alluded to in connection with the testimony of Moskowitz, he was making it "on behalf of the old organization." Though that was, indeed, the conclusion of the witness, it was also the fact, as the record well shows.

■ The prosecutor told the jury in an opening statement what the government expected to prove. It is now claimed that he overstepped the bounds of propriety in his zeal for conviction. No exception was taken to the statement when made, and there seems to have been adequate reason at the time for believing that it would be substantially borne out by the proof, as in fact it was for the most part. We think it fairly appears that the opening statement was made in good faith to inform the jury and the defense in a general way of the nature of the government's case, and that it did not go beyond this legitimate end.

Affirmed.

MANTON, Circuit Judge, dissents without opinion.