## UNITED STATES v. MINNEC.
### No. 6697.

Circuit Court of Appeals, Seventh Circuit.

April 27, 1939.

Rehearing Denied June 6, 1939.

Arthur H. Jones, of Chicago, Ill., for appellant.

William J. Campbell, U. S. Atty., Thomas B. Hart, and Roy D. Keehn, Jr., Asst. U. S. Atty., all of Chicago, Ill., for the United States.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

Appellant was charged in a sixteen-count indictment with use of the United States mails in furtherance of a scheme to defraud by means of false pretenses, representations and promises in violation of Section 338, Title 18, U.S.C., 18 U.S.C.A. § 338. He was tried by a jury, found guilty upon all counts and from the judgment pronounced thereon this appeal is taken.

While numerous errors are assigned, the ones principally relied upon, and in fact, the only ones argued and discussed by appellant are:

(1) The trial court erred in overruling the appellant's general and special demurrer to the indictment and each count thereof.

(2) That the court erred in overruling the appellant's motion asking the court to instruct the jury to return a verdict of not guilty at the close of the appellee's evidence, and also at the close of all of the evidence, and in overruling the appellant's motion for a new trial.

(3) That the court erred in admitting prejudicial and incompetent evidence.

The indictment, as is usual in such cases, describes at great length, the scheme and artifice devised. In substance, it is alleged that the appellant devised a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises from certain named persons, as well as those unnamed, residing in divers states, by the incorporation of the Cosmopolitan Mutual Benefit Association and the Lincoln National Aid Association, the avowed object of which was for charitable and beneficial purposes; to assist and provide for the sick, needy and disabled members and for the wants of the widows, orphans and dependents; that Certificates were issued to members, conferring benefits, less than promised, by literature and

statements made by the appellant and his agents; the manner of soliciting members and of operating the business, the forms of the Certificates and the provisions therein are set forth in detail, and the indictment particularly specified wherein such provisions are misleading and fraudulent; that a large portion of the contributions received from the members was appropriated by the appellant to his own use; that false and deceptive information was conveyed to the public, and particularly to prospective members by means of the circulars, pamphlets, catalogs, folders and letters by which persons were induced to become members; that no medical examination was required and that persons were solicited, who, by reason of advanced age and physical infirmities would be likely to die from certain diseases which precluded them from receiving anything more than nominal benefits; that the appellant, by reason of proxies obtained from members, was in the absolute control and management of the associations and used his power and authority in compelling members and their beneficiaries to settle claims against the associations without regard to the legality of such claims under the terms and conditions of the Certificates, thus enabling him to appropriate to his own use a large portion of the assessments received from members. The alleged fraudulent provisions of the Certificates are set forth in detail, as well as the fraudulent claims and statements made in pamphlets and literature prepared and distributed by the appellant as a means of inducing persons to become members and pay assessments. In brief, it is charged that the associations were operated for the benefit of the appellant rather than for the benefit of the members of the associations, and the details in support of that allegation are set forth. Following the description of the scheme and artifice to defraud, each count of the indictment contains a verbatim description or copy of a document or instrument which it is charged the appellant placed, or caused to be placed in the United States mail as a means of executing the alleged scheme and artifice.

▮ That the mails were used in the manner charged is not in dispute. The attack on the indictment is directed at the alleged scheme and the criticism in this respect has to do with a number of allegations, which, it is argued, are indefinite and merely represent the conclusion of the pleader. Authorities are cited to the effect that every necessary allegation in an indictment must be directly and affirmatively alleged, and that charges by implication, intendment or conclusion are insufficient. No doubt, the rule in this respect is well established, but we think it has no application in the instant situation. True, as pointed out by the appellant, there are numerous statements in the indictment, which, if considered by themselves, might properly be termed as conclusions and in some respects, uncertain and indefinite. It can not be held, however, that an indictment which goes into great detail in describing the scheme or artifice to defraud, is bad merely because it contains some statements which may properly be termed as conclusions. In the instant case, such statements may be ignored and yet we find direct and positive averments, which, in our judgment are sufficient to charge a violation of the statute. In fact, it appears the various elements of the scheme are charged with greater prolixity than the circumstances require. While the scheme to defraud is a necessary element of the offense charged, yet the gist of the offense is the use of the mails, and it is only essential that the scheme be charged with such particularity as will enable the accused to know what he may be expected to meet on trial.[1] That the appellant was so informed, there can be no doubt.

We now give consideration to the alleged error of the trial court in its refusal to direct a verdict for the appellant. With the voluminous record before us, containing several hundred exhibits it is somewhat difficult to discuss the evidence in an opinion of reasonable length. In the beginning, we think it is not inappropriate to call attention to the fact that this court recently in United States v. Littlejohn, 7 Cir., 96 F. 2d 368, considered and decided a similar case where the facts were almost identical with those of the instant case. The facts, as set forth in our opinion in that case, insofar as they relate to the scheme charged, could very well be incorporated here without doing injustice to either side. Counsel for the appellant, in the oral argument before this court, when inquiry was made as to what distinction could be made between the facts

---

[1] Brady v. United States, 8 Cir., 24 F. 2d 399, 402; Worthington v. United States, 7 Cir., 64 F.2d 936, 938; Hass v. United States, 8 Cir., 93 F.2d 427, 429.

in the two cases, pointed out only one minor distinction, which was of no consequence.

We shall, briefly, we hope, considering the circumstances, relate what we regard as the more material facts and circumstances. Prior to the organization of the associations in question, appellant had been active in the operation of similar associations, among them being the Bankers Insurance Corporation, The American Peoples League and the American Peoples Mutual Benefit Association, all of which at or. prior to the time of the organization of the associations in question, ceased to do business. On May 29, 1933, appellant and others obtained a charter for the Cosmopolitan under the laws of the State of Indiana, authorizing a society not for pecuniary profit. On February 28, 1934, the appellant obtained a charter under the laws of the State of Delaware for the Lincoln National Aid Association, the objects of which were the same as those of the Cosmopolitan. The two associations proceeded thereafter to solicit members and to issue Certificates. Appellant was President of both and acted in that capacity throughout the entire period involved in this case. No person other than he had any voice in the organization, operation, control or management of such associations. His situation was thus by reason of the fact that when a member joined the association he was required, by proxy, to authorize the appellant to act for such member in all matters pertaining to the associations.

Solicitation for memberships, as well as for representatives to solicit the same, was carried on by means of advertisements in various periodicals and magazines. Salesmen's kits were mailed to those who evidenced any interest. The advertisements, salesmen's kits, periodicals, and in fact, all literature mailed in connection with the operation of these associations, appealed to the representatives and to those to whom literature was mailed to become members, and solicited all members to become representatives for the associations. No discrimination was used in the selection of representatives. They were authorized to collect $5 initiation fee, and $1 registration fee from each applicant, to be retained by them as their commission, and to solicit the application of eligible persons from one to eighty years of age.

The business of both associations was actually transacted in an office in Berwyn, Illinois, with the same personnel and officers. An office of nominal character was maintained in Hammond, Indiana. Appellant was the only salaried officer.

We think it necessary to refer to some of the statements found in the numerous exhibits which the Government relies upon in part as disclosing the fraudulent means employed in inducing persons to become members of the associations and as a part of the scheme with which appellant was charged. In a pamphlet entitled "True Riches," copyrighted by the appellant, the associations are described as "rendering humanitarian service." The maximum benefits provided by the Certificate are set forth without any reference to the exceptions and limitations contained in the Certificate. Referring to the result which follows from illness or death of the head of a family, it is stated:

"The perfect tribute any man can give to his family is a lasting guarantee that such tragedy can never be theirs. It is all so easy, if you only will. At a cost of only $1 per month, less than the price of one moving picture show per week, you can have the protecting arm of the National Certificate issued by this Association spread over yourself and your family. * * *

"If death should result from your illness, your family will receive up to $1000 cash—and all for this small $1 per month payment. At such a low cost, you cannot afford to be without National Certificate Protection. Think of it! You could pay on a 'National Certificate' over 80 years before the amount put in would equal the benefits derived. Prepare today to face anything the future can offer, unafraid and protected."

Again:

"The 'National Certificates' issued by this Association are simple, plainly worded promises to pay DEFINITE amounts in case of sickness, disability, or death. Just plain, everyday English that you can understand without the aid of a Philadelphia lawyer. You are the sole judge—no one will call. You study the 'National Certificate' in the quiet of your home without any obligation on your part. * * *

"After you have your Certificate in your possession, you can look forward to the time when you no longer are able to carry on your work on account of old age; and then you can retire and live in comfort, while others not so fortunate to make application now are unable to make a living. Just think how wonderful it is to be

able to play with your grandchildren on the lawn of your son or daughter, and be able to feel that you are not a burden to them, because today you have signed this statement, how terrible it is for old men and women, who, unable to support themselves, are forced to accept any kind of a nasty job, because they must take anything they can get; for the average employer will not give good jobs to old men and old women. This is not right, but nevertheless is the truth. These people should have protected themselves when they were young."

In a letter accompanying "True Riches," is found this statement: "The 'National Certificate' is the most complete, all-coverage benefit certificate ever issued. Study the large benefits this Association offers for the small monthly payment of $1.00. Particularly analyze the Maximum Benefits offered by the 'National Certificate.' Note that it provides up to $3000 for Travel Accidental Death. Note that it provides up to $2000 for every known Accident. Note that it provides up to $1000 for Natural Death or old age. Note that it provides up to $30.00 weekly for Travel Accidental Disability. Note that it provides up to $20.00 weekly for Accident Disability and up to $10.00 weekly for Sickness."

In another pamphlet entitled "Mutual Crusaders' Messenger," also copyrighted by appellant, we find this statement: "Again, let me call your attention to the fact that you do not have to get sick or die to receive the Benefits of this Association, because when you have an old man on your hands, which is yourself, you should receive benefits that should take care of yourself the rest of your life. So, you see, when you join this Association and you will receive its 'National Certificate,' you virtually have made provision to take care of yourself and your loved ones in the event of your sickness, disability, old age, and death. * * * * So you see, Mr. ————, the necessity of making application now; because as long as we live, we need food, we need shelter, and we need clothes; and as we get older, disease appears, and we require medical attention. This Association furnishes these Benefits for you, if you will fill this application now, and pay the small monthly payment of one dollar per month, to keep your Membership in good standing."

In another exhibit we find: "The 'National Certificate' is issued by this Association which is Chartered and Operates *not for profit* under State Laws. It operates under the Mutual Benefit plan, which has over 760 years of successful experience, giving *safe sound,* and *economical protection* to its members *at cost.* The 'National Certificate' will protect you."

In a letter to members it is said: "This Association issues the very best of protective mutual benefit certificates for the small sum of $1.00 per month."

In a form letter which accompanied Certificates to new members, it is stated: "Always maintain your 'National Certificate' in force. Tell your relatives, friends, and neighbors, how easy it is for them to receive the protection of the 'National Certificate.' Thus you will help them to secure for themselves the best protection available for only one dollar ($1.00) per month." Also, this statement appears: "Today you have no excuse to do without life protection any longer, when, at a cost of less than 3½¢ a day, Cosmopolitan Mutual will protect you." In this letter the protection offered is described as an adequate and "amazing value in life protection."

Again, we find a Certificate described— "As the Liberty Policy is a masterpiece of protection it is to your interest and the interest of your loved ones to maintain this Policy in force at all times."

In another pamphlet we find: "Thousands of members everywhere welcome the 'National Certificate'; hundreds of letters have reached us praising this all-coverage contract. Lawyers, Doctors, Insurance Men, Priests, Ministers, Pastors, Mayors, Sheriffs, Policemen, Carpenters, Mason, Miners, etc., etc., all welcome the 'National Certificate.'"

These statements are merely typical of the many alluring representations made by the appellant in every conceivable form of advertising for the purpose, of course, of inducing persons to become members.

A person desiring to become a member was required to sign an application and to answer certain questions, the most important of which was "Are you in good and vigorous health?" In numerous instances, as disclosed, there was a failure on the part of the applicant to give any answer to this question and in numerous other instances the answer was such as to disclose that no claim to good health was made on the part of the applicant. Little, if any, at-

tention, however, was given to the answer to this question and regardless of the manner in which it was answered, the applicant invariably was accepted as a member. The failure to answer, or an answer disclosing the applicant was not in good health, was, however, frequently used by the appellant as a means of evading liability. A four-page Certificate, attractive in appearance, was issued to the member. On the first page appears the picture of Abraham Lincoln. (This refers to the Lincoln National Association, but the terms of the Certificate were similar in each instance.)

In the upper right-hand corner **in bold** type it is stated:

"Maximum Benefits

| | |
|---|---|
| $3000.00 | |
| $2000.00 | Death Benefits |
| $1000.00 | |
| $30.00 | |
| $20.00 | Weekly Benefits." |
| $10.00 | |

Commencing about the middle of the face of the policy, appears the following (Size and type of print, same as here):

**SCHEDULE OF MAXIMUM BENEFITS "NATIONAL POLICY"**

| Class | Present Age | Part 1 Death by Travel Accident or Loss of Limbs or Sight | Part 2 Death by Accident or Loss of Limbs or Sight | Part 3 Death by Natural Causes Or Age 65 | Part 4 Travel Disability Benefit Per Week | Part 5 Accident Disability Benefit All Covered Per Week | Part 6 Sickness Benefit Per Week |
|---|---|---|---|---|---|---|---|
| A | 18-74 | $3000.00 | $2000.00 | $1000.00 | $30.00 | $20.00 | $10.00 |
| B | | 2400.00 | 1600.00 | 800.00 | 24.00 | 16.00 | 8.00 |
| C | | 1800.00 | 1200.00 | 600.00 | 18.00 | 12.00 | 6.00 |
| D | | 1200.00 | 800.00 | 400.00 | 12.00 | 8.00 | 4.00 |
| E | | 600.00 | 400.00 | 200.00 | 6.00 | 4.00 | 2.50 |

GUARANTEED COST $1 PER MONTH — PROTECTION AT COST

**Benefits and Cost of All Benefits**

It appears from the evidence that 97% of all people who die in the age group, 40 to 80, die from one of the diseases or causes mentioned in this latter provision of the Certificate, and in the age group, 1 to 80 years, 90%.

On page 2 are found further limitations upon the benefits provided as shown in the schedule of benefits on the face of the Certificate. On page 3, in extremely fine print are found the conditions and by-laws of the Association. They consist of 40 articles or paragraphs. Time and space forbid more than brief reference to the same. Article 5 gives the President the control and management of the business; Article 8 provides that the President may receive 100% of the Expense Fund, 100% of all membership fees, 100% of all registration fees to use for expenses and that the remainder shall become his compensation; Article 9 makes the by-laws a part of the Certificate, and Article 23 provides for a Guarantee Benefit Fund out of which to pay benefits and an Expense Fund, such funds to be created from payments received from members. The moneys thus received are to be allocated as follows: First year, 10% to Guarantee Fund and 90% to Expense Fund; Second year, 20% to Guarantee Fund and 80% to the Expense Fund; Third and subsequent years, 30% to the former and 70% to the latter. This article also provides that in the event in any month that contributions are less than liabilities on account of claims payable, then the member shall receive proportionately less than he would be otherwise entitled. It is also provided that if the total net proceeds of one monthly contribution amount to more than is necessary to pay the claims and obligations, then the balance shall be deposited to the Expense Fund.

It was disclosed that the receipts of the Cosmopolitan for the period from August 1, 1933 to August 31, 1937, were $57,143.-61; for the Lincoln for the same period, $18,153.50, or total receipts by the two Associations of $75,297.11. During the same period, the disbursements amounted to $56,-335.67, of which the sum of $4112.45 was paid out by both Associations on all claims, both for death and disability. There was a balance in the bank as of August 31, 1937, of $3,033.62, which leaves an amount of something less than $16,000, the disposition of which is not explained by the record.

One, Edward Fackler, testified on behalf of the Government, as an expert actuary, regarding the Certificates issued by each of the Associations. His testimony was to the effect that the assessments provided to pay for $1000 worth of insurance for a person aged 18, for natural death alone would be 59% deficient; at age 35 the assessments would be 78% deficient and at age 54 they would be 90% deficient. The deficiency of assessments for other classes and ages, according to his testimony, would vary from 46 to 89%, and he gave as his opinion that neither Association could operate successfully.

We have no hesitancy in concluding that the verdict of the jury and judgment of the court were justified—in fact, it is difficult to ascertain how a different conclusion could have been reached. It would serve no useful purpose for us to indulge further in a recitation of the many facts appearing in the record, or a reiteration of those to which we have already referred, in support of our conclusion. Appellant argues at length in an effort at demonstration and that the certificate constituted a contract between the appellant and the member, and that it was the intention of the appellant to provide for the latter or his beneficiary, benefits according to the terms thereof. It is further argued that the appellant was in a position to pay such benefits and as a matter of fact, made such payments in conformity with the terms of the Certificate, and, therefore, no fraud was involved. After reading the many complicated restrictions and limitations provided in the Certificate, as well as the numerous loopholes which are provided by which the Associations might and did escape liability, we are inclined to think that appellant's argument in this respect is tenable. In other words, if we are able to understand all the terms and conditions imposed by the Certificate, which we find difficult to do, we think it may be said that the appellant possessed the ability to pay such benefits as promised. The reason we are able to countenance such an argument is that a study of the Certificate convinces us that he came as near to promising nothing as it would be possible for a man to do, skilled in this line of work, as appellant was. A study of the Certificate itself is convincing that it was designed as an entrapment for the ignorant and unwary and operated successfully as a snare and a delusion.

We have heretofore set forth the schedule of maximum benefits as appears on the face of the Certificate, and also the very small italicized print which follows this schedule, and which limits any benefits provided to such an extent that they become practically nil. It is impossible, with the means at our disposal, to portray the manner in which this particular limitation is embedded in the Certificate. Not only is the type so small as to make it difficult to read with the naked eye, but the reading of it is made more difficult by a blending of mottled colors constituting the background on which these restrictions are printed. The situation thus created must have been for the purpose of keeping a member "in the dark" as to the restrictions contained therein. Benefits by this clause were reduced to 2% of the maximum benefits in case the member died during the first 90 days the Certificate was in force of any disease or ailment mentioned therein and which, according to medical testimony is the cause of death in 97% of the people. The benefits are increased 2% each 90 days thereafter until the maximum benefit is reached. To make certain, however, that no member escape the devastating effect of this limitation, it was further provided that if any person die with any chronic or undetermined disease or ailment, that the benefit should likewise be 2% of the stated maximum benefit. Further conditions and limitations found on the inside pages of the Certificate, as well as the constitution and by-laws, are equally confusing and deceptive. Instead of containing "plain, everyday English that you can understand without the aid of a Philadelphia lawyer," the language employed would tax the ingenuity of layman and lawyer alike.

While we think, as stated, that fraud is apparent from the Certificate itself, there can be no doubt of the fraudulent scheme when the Certificate is taken into consideration with the many false, enticing and alluring statements and promises which were made by the appellant for the purpose of inducing persons to become members. We have heretofore made reference to some of such statements and we need not repeat. It is sufficient to state that the evidence in this respect establishes fraud of a vicious character, the consequences of which resulted in disappointment, hardships and financial loss to those who relied upon and gave credence thereto. While we recognize that some latitude is allowable to a person engaged in business in extolling the virtues of that which he offers to the public (sometimes referred to as "puffing") yet there must be a limit, which in this case was reached far short of the false, misleading and fake promises made by the appellant, or at any rate made under his direction and with his approval as a means of inducing persons to become members of these Associations and thereby obtain their money.

Complaint is also made concerning the admission of evidence. Our attention is called particularly to the testimony of the witness, Fackler, who qualified as an expert actuary and testified as such. The witness was permitted to read or describe various provisions of the Certificate and to express an opinion as to their effect and as to the effect of the Certificate as a whole. We do not think the court committed error in this respect. The Certificates were written in language complicated and confusing, so much so that the jury could not have been expected to obtain an intelligent conception of the same without such testimony. In addition, our review of the record convinces us that the charge was so thoroughly established that even if there be error in this respect, it was inconsequential.

The judgment is affirmed.