## UNITED STATES v. B. GOEDDE & CO. et al.
### No. 15253.

District Court, E. D. Illinois.
Sept. 6, 1941.

Paul V. Ford, Sp. Asst. to the Atty. Gen., of St. Louis, Mo., Roscoe Steffin, Sp. Asst. to the Atty. Gen., of Washington, D. C., Arthur Roe, U.S.Dist. Atty., of Danville, Ill., and Walter R. Powell, Jr., of Washington, D. C., for plaintiff.

Baker, Lesemann, Kagy & Wagner, of East St. Louis, Ill., Terry, Gueltig & Powell and M. D. Powell, all of Edwardsville, Ill., Karns & Bandy, of East St. Louis, Ill., Phillip Liestman, of Alton, Ill., Lindauer & Lindauer, and Sam S. Pessin, both of Belleville, Ill., R. E. Costello, of East St. Louis, Ill., Carl W. Feickert, of Belleville, Ill., Thos. Williamson, of Edwardsville, Ill., Oehmke & Dunham, of East St. Louis, Ill., Manuel M. Wiseman, of Alton, Ill., L. Harold Degnan, of East St. Louis, Ill. and Bryan Purteet, of St. Louis Mo., for defendants.

LINDLEY, District Judge.

The indictment charges that defendant labor unions and officers thereof, finishing mill operators, engaged in the manufacture and sale of millwork, kitchen cabinets, prefabricated houses and other lumber products, and certain individuals participating or otherwise interested in the alleged violation conspired and combined in violation of the Anti-Trust Act. To the charge, defendants have interposed: (1) motions to quash; (2), pleas in abatement and (3), petition of one for return of documents. The Government has demurred to the pleas and interposed its motion to impound the documents held. Certain of defendants' pleas in abatement go to the sufficiency of an indictment of unincorporated associations and certain others assert immunity from prosecution. Extensive briefs have been filed and extended arguments presented.

Defendants are charged with a conspiracy, (a), "unreasonably to prevent persons, * * * in the East St. Louis area from purchasing, using, and installing * * * building products manufactured in states other than * * * Illinois"; (b), "to prevent manufacturers of such products located in states other than * * * Illinois from selling * * * in the East St. Louis area"; (c), "to increase artificially and maintain high and noncompetitive prices for similar products permitted by defendants to be sold in the * * * area"; (d), all "in restraint of trade and commerce in prefabricated houses, kitchen cabinets, millwork and other building products among the several states" in violation of the Anti-Trust Act; (e), the control effectuated has been detrimental to the public interest and has deprived purchasers and prospective purchasers of prefabricated houses and lumber products of free and unrestricted competition therein.

Relative to the means employed, certain specific acts are charged:

(1) Contracts were executed between defendant mill owners and unions, (a), providing for employment of only such persons as are members of the unions; (b), permitting the mill owners to use the American Federation of Labor Union label; (c), excluding unlabeled lumber.

(2) Acts of the unions: (a), the unions warned builders that their members would not erect, utilize or install such products as did not bear the label; (b), the unions required that certain products bear the label and warned purchasers and prospective purchasers that material bearing no label would have to be removed from "the job" and returned to the manufacturer or, (c), no member of the union employed on a job where unlabeled goods were used would be permitted to work but all members would refuse to work; (d), manufacturers supplying such unlabeled material were forced by the unions to remove it from the job and return it to plants outside Illinois.

(3) Coercion: (a), the unions intimidated and coerced, by strikes and threats to strike, builders, forcing them to purchase material bearing the union label from defendant mills although "similar products could be purchased at lower prices in Missouri and other states"; (b), the unions refused to install material manufactured in states other than Illinois; (c), they refused to erect prefabricated houses manufactured outside Illinois; (d), the unions have threatened to commit and committed acts of violence in order to restrict mill owners in the area of East St. Louis.

(4) Acts of violence: (a), The unions have violently assaulted and beaten laborers not affiliated with them, to prevent and discourage the latter's working on material not bearing the label; (b), they have threatened violence and bodily harm to members of such persons' families; (c), they have threatened to destroy products not so labeled; (d), they have prevented members of other labor organizations, affiliated with the union defendants through the American Federation of Labor, from work-

ing upon such material and such laborers have refused to work or haul same.

The intent and purpose of defendants are said to be: (a), to prevent manufacturers of material not bearing the label from competing with other mills and mill owners; (b), to maintain the prices of such products at an unreasonably high level; (c), to raise artificially prices of products; (d), to limit their production in states other than Illinois for shipment to Illinois; (e), to restrict the amount of products coming into Illinois; (f), to discriminate between sellers and purchasers in East St. Louis area for the benefit of defendant mill owners; (g), to exercise complete control over the East St. Louis market in prefabricated houses, millwork and other building products for the benefit of defendants; (h), (negative), not with any intent to raise wages, shorten hours, better working conditions or terms of employment or other legitimate or normal objective of labor unions but with the intent, unduly, to restrict interstate commerce.

■ Sufficiency of the indictment so far as notice and certainty are required. In United States v. General Motors Corp., D. C., 26 F.Supp. 353, Judge Slick held sufficient an indictment charging violation of the Anti-Trust Act in some seventy-two paragraphs. Subsequently, at the trial, I adhered to his conclusions. The conviction was affirmed in United States v. General Motors Corp. et al., 7 Cir., 121 F.2d 376. What was said there is applicable to and decisive of the issue here. It is not necessary to set out in detail the evidence of a conspiracy or to describe it with the same degree of particularity as a substantive offense. Mercer v. United States, 3 Cir., 61 F.2d 97. All that is essential is certainty to a common intent sufficient to identify the offense which defendants are charged to have conspired to commit. Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278; Blaine v. United States, 5 Cir., 29 F.2d 651, certiorari denied 279 U.S. 845, 49 S.Ct. 342, 73 L.Ed. 990.

■ The indictment contains some twenty-two printed pages. As is readily apparent from the excerpts included herein, the charge is clear and the means and methods pursued to achieve the same are set forth in detail, sufficiently explicitly to afford to all defendants a clear understanding of the charge submitted and to protect them from the possible peril of double jeopardy growing out of any subsequent prosecution. United States v. Patterson, 6 Cir., 201 F. 697, certiorari denied 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499; United States v. MacAndrews & Forbes Co., C.C., 149 F. 823, writ of error dismissed, 212 U. S. 585, 29 S.Ct. 681, 53 L.Ed. 661; United States v. Moore, D.C.E.D.Ill. 7 F.2d 734. The language of United States v. Moore et al., D. C., 7 F.2d 734, 736, where I had occasion to consider the sufficiency of an anti-trust indictment, is applicable to the present cause: "The elements of the crime are not only charged in the language of the statute, but the means whereby the combination or conspiracy is and has been formed and carried on, and the details thereof, adequate to identify the specific combination or conspiracy and to enable the defendants to prepare for trial and to protect them against a new prosecution in the event of acquittal or conviction, are likewise all set forth with particularity and definiteness."

■ I do not accept the suggestion that several separate and distinct conspiracies are charged. An indictment is not duplicitous because it alleges different means of accomplishing the purpose. Duplicity arises from charging more than one offense; not from charging a single offense committed in more than one way, Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, or from pleading different acts, if they contribute to the ultimate, charged offense. United States v. Mac Andrews & Forbes Co., supra. The test for duplicity must be applied only to the result charged and not to averments of various methods of its attainment.

■■ It is insisted by certain defendants that their relationship, each with the others, is not disclosed. The indictment charges that "all defendants have entered into and engaged in a combination or conspiracy with each other." This is a sufficient charge under the statute. If there remains any reasonable ground for additional information as to the participation of any defendant, a remedy exists in a motion for bill of particulars. The Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, does not make the doing of any act other than the act of conspiring a crime. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232.

**528**

It is said that the indictment does not state facts but conclusions of law. The purpose of the pleading is to guarantee that proper notice of the charge be given; and it seems obvious here, upon careful reading, that the indictment makes such a full disclosure. That only ultimate facts are pleaded and the details of evidence omitted furnishes no valid ground for objection. If any averments constitute, strictly speaking, conclusions of the pleader, they will not vitiate the indictment when the strict averments of fact constitute, as here, complete notice. The United States Circuit Court of Appeals for this Circuit, in United States v. Minnec, 104 F.2d 575, 577, said: "It can not be held, however, that an indictment which goes into great detail in describing the scheme or artifice to defraud, is bad merely because it contains some statements which may properly be termed as conclusions. In the instant case, such statements may be ignored and yet we find direct and positive averments, which, in our judgment are sufficient to charge a violation of the statute. In fact, it appears the various elements of the scheme are charged with greater prolixity than the circumstances required. While the scheme to defraud is a necessary element of the offense charged, yet the gist of the offense is the use of the mails, and it is only essential that the scheme be charged with such particularity as will enable the accused to know what he may be expected to meet on trial. Brady v. United States, 8 Cir., 24 F.2d 399, 402; Worthington v. United States, 7 Cir., 64 F.2d 936, 938; Hass v. United States, 8 Cir., 93 F.2d 427, 429. That the appellant was so informed, there can be no doubt."

The indictment refers repeatedly to the East St. Louis area. The contention of defendants that these words are indefinite and uncertain appears frivolous when we remember that the indictment defines the East St. Louis area as that including the city of East St. Louis and the counties of St. Clair, Madison and Monroe. The venue is clearly averred in the Eastern District of Illinois. The East St. Louis area is part thereof. Conspiracies may be tried in any jurisdiction in which the conspiracy or some act pursuant thereto took place. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700.

The unions insist that they are not subject to prosecution as voluntary associations. Any such controversy seems settled by the language of the act itself. Section 8 whereof provides that the word "person" or "persons" shall include corporations and associations, 15 U.S.C.A. § 7. And Mr. Chief Justice Taft settled the question, so far as civil suits are concerned, in United Mine Workers v. Coronado Coal Company, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975. The unions there, associations, were held liable. I know of no sound reason why they can not reasonably be punished for violating a statute creating an offense malum prohibitum in character. Such is the clear purport of the decisions. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196. Anderson v. Ship Owners' Association, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298; International Organization v. Red Jacket Coal Co., 4 Cir., 18 F.2d 839, certiorari denied Lewis v. Red Jacket Consolidated Coal & Coke Co., 275 U.S. 536, 48 S.Ct. 31, 72 L.Ed. 413; Brown v. United States, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500; United States v. Greater New York Live Poultry Chamber of Commerce, D. C., 30 F.2d 939; United States v. Lanza, 2 Cir., 85 F.2d 544.

Preceding the charge of conspiracy, the indictment includes paragraphs 9 and 10 as follows:

"9. The Grand Jurors present that from the year 1937 and for many years prior thereto until the finding of this indictment a condition of affairs has existed in the building industry in St. Clair, Madison and Monroe Counties in the State of Illinois, which should never be countenanced in a free society: Men going about their daily affairs have been assaulted and beaten up; they and their families have been threatened bodily harm; workmen have been driven out of the district; houses under construction have been bombed; plaster has been creosoted; plumbing fixtures have been destroyed; the police and the local law enforcement officers have often stood by taking no steps sufficient to apprehend and punish the wrongdoers; and the decent law-abiding citizens of the community, having nowhere to turn, are afraid to bear witness to the facts.

"10. The Grand Jurors further present that housing conditions in St. Clair, Madison and Monroe Counties in the State of Illinois are in a deplorable condition: New building costs are from twenty percent to twenty-five percent higher than those pre-

vailing in similar communities in the State of Missouri; material costs, especially in the case of millwork, are disproportionately high; many prefabricated materials, though both cheaper and better than the old fashioned products, are kept out of the East St. Louis area; many labor restrictions exist concerning jurisdiction and other matters which add unnecesssarily to labor costs; many reputable contractors from outside the area, who employ organized labor, refuse to bid on work in the area under any circumstances; new construction is small in volume and often poor in quality; many homes are in need of paint and repairs; rents are unduly high; and many persons, who have attempted to build and repair their homes with their own hands, have had their homes bombed."

Thus is presented pictorially to the jury a revolting condition, abhorrent to the innate sense of right and fairness present in every decent human being's breast. Inasmuch as any interested party may read the indictment to the jury and it may properly be submitted to that body for consideration at the conclusion of the trial, it is apparent that this statement of conditions which "should never be countenanced in a free society," and which naturally tends to inspire in all law-abiding people resentment and righteous outrage will tend to destroy that ideal of American jurisprudence, a fair, impartial trial as guaranteed by the constitution. Such a trial should be surrounded by every reasonable safeguard to insure the absence of any improper influence operating on the minds of the jurors and to give to their verdict, that dignity, impartiality and respect so essential to the maintenance of a correct administration of justice. Ogden v. United States, 3 Cir., 112 F. 523.

The Government insists that the quoted paragraphs are merely descriptive of the "matrix in which the conspiracy charged was formed"; that, through the medium of the background, the charge of conspiracy is brought into bold relief and more easily comprehended because of the perspective thus afforded. I recognize that, in determining the question of legality, the court and jury must consider the facts peculiar to the business to which the restraint is applied; the condition of the industry before and after the restraint was imposed; the nature and history of the restraint and its effect, actual or probable; the evil believed to exist; the reasons for adopting the particular remedy and purpose and end sought to be obtained, Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, Ann. Cas.1918D, 1207, and that it is not only proper but necessary to set forth fully the origin and character of defendants, the history of the conspiracy and the alleged unlawful conduct and the methods of business in the respect complained of. Ware-Kramer Tobacco Co. v. American Tobacco Co., C.C., 178 F. 117. But the averments here attacked are not pleaded as effects or results of the conspiracy but rather as an introductory background without any charge that defendants were responsible for the condition charged to exist. Defendants are responsible only for what they themselves have done and before evidence of these facts could be admitted, it would be essential to charge and prove that they brought about or effectuated the revolting circumstances asserted to exist. This is not a trial before the court, which may ignore improper averments, but before a jury charged with the duty of deciding impartially, unimpassionately, the guilt or the innocence of the persons charged.

 It is said, however, that if anything contained in the paragraphs mentioned is not admissible it may be discarded as surplusage without invalidating the indictment. A useless averment is superfluous and may be ignored. Ford v. United States, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793. But, as was said in United States v. American Medical Association, D. C., 28 F.Supp. 752, it is doubtful if such treatment will suffice to relieve defendants from the prejudice likely to arise from a recital which smacks so much of a colorful, inflammatory, argumentative discourse. In other words, while mere surplusage will not affect the substantial rights of defendants and render the indictment invalid, the defect is not harmless, if the matter complained of tends to prejudice the accused in their right to an impartial trial. It might not be amiss for the Congress to give to judges the power to strike from indictments, immaterial averments of inflammatory character. But until it sees fit to lodge in the courts such discretion, we must refrain from exercising it.

 We approach now a troublesome question, viz, how far have the acts of Congress gone in exempting labor unions from the operation of the Anti-Trust Act?

Under United States v. Hutcheson, 312 U. S. 219, 61 S.Ct. 463, 85 L.Ed. 788, the sufficiency of an indictment of labor unions for violation of the Anti-Trust Act rests not only upon the terms of that statute but also upon those of the Clayton Act, 29 U.S. C.A. § 52, and the Norris-La Guardia Act, 29 U.S.C.A. §§ 101 to 115 inclusive. The majority opinion of Mr. Justice Frankfurter indicates clearly that if the acts complained of on the part of labor unions are not such as can be enjoined under the two later congressional enactments, they can not be made the basis of a valid indictment. Consequently it is essential to determine whether the acts charged here are within the category of those which may not be enjoined.

The Clayton Act provides that there shall be no injunction against (a), terminating any relationship of employment; (b), ceasing to perform labor; (c), persuading others by peaceful means to cease work; (d), attending at any place where persons may lawfully be for the purpose of obtaining or communicating peaceably information; (e), persuading peaceably any person to work or to abstain from work; (f), ceasing to patronize or employ any party to a labor dispute; (g), recommending, advising or persuading others by peaceable means to cease so to patronize; (h), peaceably assembling in a lawful manner for lawful purposes; (i), doing any act or thing which might lawfully be done in the absence of a labor dispute. The section concludes thus: "nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

Under Section 104, the Norris-LaGuardia Act forbids injunction from (a), ceasing or refusing to perform work or to remain in employment; (b), becoming or remaining a member of a labor organization; (c), paying to or withholding from any party to a labor dispute any unemployment benefits; (d), aiding by any lawful means any person participating or interested in any labor dispute, who is party to an action in court; (e), giving publicity to the facts involved in a labor dispute by advertising, speaking or patrolling or by any method not involving fraud or violence; (f), assembling peaceably to act in promotion of the laborers' interest in a labor dispute; (g), advising or notifying any person of an intention to do any of the aforesaid acts; (h), agreeing with other persons to do or not to do any of the aforesaid acts and (i), advising, urging or inducing without fraud or violence, any of the acts aforesaid.

Section 105 provides that no injunction shall issue upon the ground that persons participating or interested in a labor dispute are engaged in an unlawful combination or conspiracy because of doing in concert any of the acts enumerated in the foregoing section. This law was enacted in 1932; the Clayton Act in 1914.

Before United States v. Hutcheson, supra, the courts quite generally recognized invalidity of acts of labor unions where their ultimate effect was to violate the Anti-Trust Act. An outstanding example is Bedford Cut Stone Co. v. Journeyman Stone Cutters Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, where the court found that, inasmuch as the conduct of the unions deliberately, substantially and directly curtailed the flow in interstate commerce, it was, therefore, illegal. I presided over the trial of United States v. Painters' Dist. Council, etc., D. C., 44 F.2d 58, wherein the Government charged the unions with conspiracy to prevent bringing into Chicago from states other than Illinois, certain building materials, cabinets and woodwork. I applied the doctrine of the Bedford Cut Stone Co. v. Journeyman Stone Cutters Ass'n, supra, and entered a decree of injunction. I relied also upon the case of Boyle v. United States, 7 Cir., 40 F.2d 49, over the trial of which I had presided in the District Court. In an earlier case, the United States Circuit Court of Appeals for this Circuit decided Boyle v. United States, 259 F. 803, 807. There defendants consisted of labor union officials and local electric companies in Chicago. The indictment charged that they combined to prevent certain electrical appliances from being transported to Chicago and from entering Chicago, in restraint of interstate trade. The conviction was affirmed. The court said: "The reasons which actuated the parties to thus conspire and combine may have been and doubtless were quite different. The manufacturer was induced to enter into the agreement because of a desire to eliminate competition. He also wanted to settle his labor problem. The representatives of the unions were actuated by a different motive. But it was not the motive, but the common and concerted action of the parties for the unlawful purpose

of restraining interstate commerce for which plaintiffs in error were indicted and convicted."

While Mr. Justice Frankfurter does not in so many words disapprove such earlier cases, he does announce that the Norris-LaGuardia Act was passed in an attempt to limit the invalidity of acts of labor unions to the extent that the same had previously existed. He declares that the allowable area of union activity was not to be restrained as it had been in Duplex Printing Press Co. v. Deering et al., 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196, and the trial courts are instructed by the opinion that whether trade union activities constitute a violation of the Sherman Act is to be determined only by reading it in connection with the Clayton and the Norris-LaGuardia Acts "as a harmonizing text of outlawry of labor conduct." [312 U.S. 219, 61 S.Ct. 466, 85 L. Ed. 788.] In other words, if the acts said by the indictment to violate the Anti-Trust Act are legally permissible under the Clayton and Norris-LaGuardia Acts, they do not constitute such a violation. As to such allowable acts, immunity from prosecution exists. It would seem to follow that many of the decisions preceding the Norris-LaGuardia Act are now very largely modified and limited in their effect. Our new yardstick of validity is to be found not in them but in this, the most recent decision of the Supreme Court.

Prior to the passage of the Norris-LaGuardia Act, in 1926, the Supreme Court decided United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 170, 71 L.Ed. 403, and, in the absence of United States v. Hutcheson, that decision would control here. There as here, defendants were mill owners and labor unions. The mills were in competition with others in states other than Illinois, as in the case at bar. The unions and the mill owners entered into an agreement that the union members would work only with or upon union labor material as here. The evidence was that the agreement was entered into because the mill owners of Chicago and the unions found that the outside mills, with cheaper production, were lessening activity of the mill owners and cutting down employment in Chicago. The court said: "They wished to eliminate the competition of Wisconsin and other nonunion mills, which were paying lower wages and consequently could undersell them. Obviously it would tend to bring about the desired result if a general combination could be secured under which the manufacturers and contractors would employ only union carpenters with the understanding that the latter would refuse to install nonunion-made millwork. And we think there is evidence reasonably tending to show that such a combination was brought about, and that, as intended by all the parties, the so-called outside competition was cut down, and thereby interstate commerce directly and materially impeded. The local manufacturers, relieved from the competition that came through interstate commerce, increased their output and profits; they gave special discounts to local contractors; more union carpenters secured employment in Chicago, and their wages were increased. These were the incentives which brought about the combination. The nonunion mills outside of the city found their Chicago market greatly circumscribed or destroyed, the price of buildings was increased, and, as usual under such circumstances, the public paid excessive prices.

"The allegations of the bill were sufficient to cover a combination like the one which some of the evidence tended to show. It is a matter of no consequence that the purpose was to shut out nonunion millwork made within Illinois, as well as that made without. The crime of restraining interstate commerce through combination is not condoned by the inclusion of intrastate commerce as well. The applicable principles have been sufficiently indicated in [W.W.] Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Eastern States Lumber Association v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L. Ed. 963."

In United States v. Hutcheson, supra, Mr. Justice Frankfurter said that, so long as a union acts in its self interest and does not combine with "non-labor groups," "the licit and the illicit under § 20" of the Clayton Act "are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." In his footnote, he cited for comparison United States v. Brims, 272 U.S.

532

549, 47 S.Ct. 169, 71 L.Ed. 403. He did not say that that decision was overruled; nor did he say explicitly that if unions combined with nonunion groups, their acts would be immune. I take it that, by the language used, he held in effect that the doctrine of such cases as United States v. Brims, supra, must be modified to this extent, that if the acts or agreements of unions with third persons do not include anything other than the acts legalized by the Clayton and Norris-LaGuardia Acts, then they will not support an indictment; but that to the extent that the acts complained of go beyond the conduct of unions legalized by the same acts, they may be the basis of a valid indictment under the Sherman Act.

 In following the prescribed test, let us see which of the alleged means employed and acts of labor unions are exempted from criminal prosecution under the Clayton Act. In the analysis hereinbefore set forth the acts mentioned under 1(a) and (b) (Paragraph 48 of the indictment), relating to contracts for closed shops and use of the label are clearly within the legitimate activities of unions as contemplated by the Clayton Act. Under 2(a) (b) (c) and (d) (Paragraph 49), it is alleged that the unions warned builders that they would not work with unlabeled materials; warned purchasers that such material would have to be removed and returned to the manufacturer and forced the makers of such material to remove the same from the job and return it to the plants. It would seem obvious that these acts are likewise granted immunity by the Clayton Act. Under 3 (Paragraph 50) we have alleged intimidation of builders by strikes and threats to strike, thereby forcing them to buy union labeled material, although similar products could be purchased at lower prices in other states. This too is exempt within the language of the Clayton Act. The resulting effect upon interstate commerce is purely incidental, United States v. Hutcheson, 312 U.S. 219, at page 241, 61 S.Ct. 463, 85 L.Ed. 788. Each of the acts thus far mentioned apparently is, by the Clayton Act, recognized as a legal economic weapon of labor unions.

There remain to be considered charges of other means and acts of somewhat different character. Under 3(d), (Paragraph 50), it is charged that the union refused to install material manufactured in states other than Illinois and refused to erect prefabricated houses manufactured outside of Illinois and under 4 (Paragraph 51), that they have violently assaulted and beaten laborers not affiliated with them, threatened violence and bodily harm to members of such persons' families and threatened to destroy property not labeled with union labels and that they have forcibly prevented members from other labor organizations from working upon the material. Each of these latter acts is granted no immunity by either the Clayton Act or the Norris-LaGuardia Act. Neither of those legislative enactments contemplated that it be legitimate for unions to combine with others for the purpose of preventing the use of material moving in interstate commerce; to employ as a means violent assault and battery in the achievement of keeping out such material or to destroy property which they may deem undesirable. Such acts have never been stamped by Congress with a certificate of approval.

Thus it is apparent that the indictment in this case, under the charge of conspiracy and combination unduly to restrain commerce between the several states, has set forth the acts and means by which the labor unions are said to have carried out such conspiracy. Of those acts, under United States v. Hutcheson, the greater part are granted immunity by Congress in the Clayton Act. But there remain the charge, first, of violation of the Anti-Sherman Act; second, that the unions refused to permit the use of material from outside the state of Illinois and, third, that the unions made use of force and violence in preventing work being done upon material being brought in from other states. These acts, unexempt from prosecution, constitute a valid charge of violation of the Anti-Trust Act. If we eliminate the additional averments as to means and acts, which under United States v. Hutcheson, by virtue of the Clayton Act, are granted immunity, the indictment still contains a valid charge. Bolstering this conclusion are the averments of Paragraph 52 which charge that the acts of defendants related elsewhere were not committed with any intent to raise wages, shorten hours, better working conditions or any other legitimate intent of unions but with the purpose of violating the Sherman Act.

But what is the effect of including, with the valid charge, averments of many acts which Congress has seen fit to exempt from prosecution? They are surplusage, and as

such may be ignored. Were they the only instances of surplusage in the indictment, I might well rule that the valid charge of the indictment is not nullified by the presence of immaterial statements, but the presence of this surplusage should be considered in connection with my discussion of the background statements.

I feel that the language of the so-called background paragraphs is such as not properly to protect defendants in a fair and impartial trial. In addition there is such doubt in my mind as to the propriety of inclusion of immune acts on the part of labor unions, in view of the decision in United States v. Hutcheson, that I think the question ought to be authoritatively decided before we enter into a long and protracted jury trial. As a result of my analysis, it is apparent that the charge is more than a simple direct charge of violation of the law. It includes not only statements as to abhorrent conditions as background of the conspiracy without charging defendants with participation therein but also as means and methods many acts as to which the unions are granted immunity.

The demurrers of the Government to the pleas in abatement which question the sufficiency of the indictment of voluntary associations, will, for reasons hereinbefore stated, be sustained. I think there is no doubt that the indictment sufficiently advises the defendants of a valid charge against them, but I have the conviction that any question as to the sufficiency of the indictment in the respects named should be eliminated before the Government and defendants are subjected to the heavy expense involved in a trial. The district judge may rightfully exercise his own judgment, but, as a trial tribunal whose decision is subject to review, he should consider practicalities. From a practical standpoint, therefore, in view of the fact that my adjudication may be subject to review not only by the United States Circuit Court of Appeals but also by the Supreme Court of the United States, it seems to me only fit and proper that, in an effort to avoid unnecessary labor and expense to the parties involved, I act so as to secure a final adjudication as to the sufficiency of the indictment, if possible, before trial. It is with this thought and with the hope that there may be an early review of my decision that I conclude that the motions to quash should be sustained.

■ Defendant Hanselman has moved to quash the indictment for the reason, as he says, that he appeared before the Grand Jury and gave evidence in pursuance of a subpoena duces tecum directed to a mill company of which he was president, commanding him to produce certain documents of that corporation. He appeared, produced the documents and testified without any knowledge that his own conduct was under investigation. The documents produced were not those of defendant but were those of the corporation. Hence he could not have immunity for their production. As to his testimony, it is obvious that it was given freely and voluntarily without any claim of immunity. Furthermore the plea is not sufficient to advise the court whether defendant testified to anything prejudicial to himself.

■ The better rule, apparently, is that, in view of the fact that Congress has enacted an immunity statute, 15 U.S.C.A. §§ 32 and 33, one who claims immunity, in all fairness to the prosecuting authorities, should make known his claim of privilege and failing to do so, waives it. Johnson v. United States, 4 Cir., 5 F.2d 471. If, under the statute, the witness objects to testifying, the Government may determine as a practical question whether it will continue with the prosecution, grant him immunity or proceed otherwise. It is only reasonable, therefore, that in order that there be no prejudice of the Government in its prosecution of crime, it receive express notice of the claim. Here there was no notice; the motion fails. Benetti v. United States, 9 Cir., 97 F.2d 263.

■ Certain unions and officials thereof insist in pleas of abatement that they have been subjected to unlawful searches and seizures and compelled to be witnesses against themselves. During the course of the grand jury investigation subpoenas duces tecum were issued for the District Council and the secretary and treasurer thereof and the president of Local Union 167 of Carpenter and Joiners. These subpoenas called for production of the records and proceedings of the Carpenter Council and all committees and subgroups thereof. The three officials mentioned appeared before the grand jury and upon advice of counsel claimed immunity for themselves and for all members of their local unions and the unions themselves. The grand jury refused immunity;

they thereupon refused to testify. The matter was presented to the court and Judge Wham denied motions to quash, vacate and suppress the subpoenas and ordered defendants to produce the records. It seems obvious, therefore, that the issue has previously been decided by this court adversely to defendants. As a coordinate judge of the same court I should not disturb the adjudication.

 However, it is further apparent that inasmuch as the voluntary associations are subject to indictment, as has been pointed out, and constitute, in view of the law, separate legal entities, the pleas are bad on their face as to any immunity claimed for the voluntary associations. Nor can the contention that immunity extends to each and every member of the association, so far as the association's documents are concerned, have any force. Obviously, any witness may assert and maintain his constitutional right to refuse to incriminate himself. But the papers of the association are in no wise the papers of each of the members. They belong to the separate entity, the association, which is itself indicted and which, under the statute, is not immune from production of testimony. No immunity can be claimed by any individual because of the contents of documents of a third person, including an association. Furthermore the individual officials have no right to complain if they produce papers of the association which they hold not in their private capacity but as officials of the separate legal entities. Then, too, the pleas do not disclose any defendant's testimony which tends to incriminate him. The production of the documents was a duty imposed upon defendants. Heike v. United States, 227 U. S. 131, 33 S.Ct. 226, 57 L.Ed. 450, Ann.Cas. 1914C, 128; Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann. Cas.1912D, 558; Brown v. United States, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Davis v. Securities & Exchange Comm., 7 Cir., 109 F.2d 6.

 Defendant Mildred Draper moves to have returned to her certain documents so that she may adequately prepare for trial. The Government resists the motion and moves that the papers be impounded. Obviously the rights of each will be fully protected if the papers are impounded in the Clerk's Office and each party allowed access thereto. The motion for the return of the documents will be denied. The cross motion to impound them with the Clerk is allowed, provided, however, that either party may examine them in the presence of a Deputy Clerk or other representative of the Government.

It is perhaps true that in view of my ruling upon the motions to quash, my further conclusions upon other issues are unnecessary but, if upon review the indictment should be held sufficient, then adjudication of the other issues raised by the various pleas and motions, will have been made and the court of review will have before it the entire record and may determine whether upon any ground my decision should be affirmed or reversed.

For the reasons stated and only because of them, the motions to quash are allowed; the demurrers to the pleas in abatement sustained.